Durfee, Judge,
delivered the opinion of the court:
This is a suit to recover damages for delays due to the fault of the Government arising out of a subcontract (later *54 assigned to the Department of tbe Army), entered into by plaintiff with the prime contractor, Hiwassee Constructors on October 27, 1952. The subcontract covered rehabilitation of piping, mechanical and electrical equipment of the North Acid area of the Volunteer Ordnance Works at Chattanooga, Tennessee.
Plaintiff claims damages for breach of the subcontract through unreasonable delays caused by defendant which increased its cost for equipment, overtime and overhead. More specifically, plaintiff claims that defendant’s refusal to grant time extensions until after the expiration of the original contract performance period, coupled with defendant’s demands throughout the original performance period that plaintiff complete its subcontract on time despite delays caused by defendant, caused great overtime expense, thereby increasing the cost of performing the contract.
Defendant, besides denying that it caused any delay to plaintiff, has raised several defenses including lack of privity between plaintiff and defendant, accord and satisfaction, and plaintiff’s failure to exhaust its administrative remedy. We believe that plaintiff’s claim may be disposed of on the ground that an accord and satisfaction was agreed upon by the parties, and therefore will limit ourselves to that aspect of the case.[1]
At the outset, let us make clear our belief that there is no doubt that plaintiff suffered considerable expenses as the result of Government occasioned delays. Our findings of fact establish that plaintiff was delayed a total of 60 days in the completion of the work. It would be far too cumbersome to examine the specifics of each delay claim in the body of this opinion, so for the sake of brevity, they will not be delved into further.
The contract in issue contained no specific provision authorizing payment for delays, such as a “suspension of work” clause which is sometimes so treated. It did contain ia *55 “changes” clause which provided for an equitable adjustment for the reasonable cost of performing extra work. Due to hastily drafted and incomplete specifications, plaintiff was compelled to perform a great amount of extra work, work not included in the original contract specifications. At various times during the performance of the contract, plaintiff was given equitable adjustments in the form of additional compensation for the performance of extra work. Also, at various times during performance, plaintiff requested extensions of time due to the quantity of extra work ordered outside the original contract. These requests were rejected however, and plaintiff had to use extra help and pay overtime wages in an attempt to complete the contract on time. Finally, eight days after the scheduled completion date of the contract, plaintiff was allowed an extension of time. Subsequent extensions of time were thereafter given; however, they came too late to benefit plaintiff. The rejections of plaintiff’s requests for time extensions caused plaintiff to make unnecessary expenditures in overtime in order to meet a completion date which intervening circumstances (Government caused delays) had made unrealistic. The subsequent time extensions which were granted could in no Avay have helped plaintiff avoid the previous investments in overtime. Had plaintiff been able to anticipate the time extensions which were eventually granted, the overtime and extra forces which it employed to accelerate completion of the original subcontract work would have been sharply reduced, if not eliminated.
After completion of the contract, plaintiff was not satisfied with two contract modifications which had been proposed as payment for some of the aforementioned extra work. Plaintiff accepted the sums offered, hut not unqualifiedly, as it reserved its rights in this matter and specifically stated in written form that it was appealing to the Chief Engineer, Washington, D.C. for the additional sums to which plaintiff believed it was entitled.
After a duly filed notice of appeal, plaintiff filed its appeal with the Engineers Claims and Appeals Board, seeking payment of $265,688.03 as additional equitable adjustment under *56 the contract. Representatives of plaintiff then agreed to meet with the Division Engineer, South Atlantic Division, Corps of Engineers, in an attempt to work out a fair price for the performance of the work in issue.[2] The parties met for a 30-day period, and considered in great detail the aspects of plaintiff’s claim. Thereafter, the Division Engineer put out a detailed Conferees Report on Review of Claim which concluded that plaintiff was entitled to be paid $114,673.28 more than it had been paid in the two aforementioned contract modifications. The following conclusions were among those agreed to by the conferees:
(1) A forty-hour work week was used from the start of construction through January 1953.
(2) A forty-eight hour work week or more was used from February 1953 through to completion.
(3) There was approximately a 300 percent turnover in labor.
(4) There was no delay in construction due to late delivery of materials or equipment.
(5) The agreement on the amount of direct labor involved in the disputed items was increased by one-third to provide for lost time, on the basis of two hours lost time for each 8 hour work day.
(6) An amount of 16% percent was included in the estimates for overtime premium payment, based on an average week of 48 hours with premium payment for 8 hours.
(7) Allowances for overhead included, among other matters, costs of supervision, tools, equipment and supplies, and equipment operators.
The Conferees Report was sent to the contracting officer who would not accept it. However, plaintiff then submitted the dispute to the Engineers Claims and Appeals Board on the record, including the Conferees Report. The Board found plaintiff due the sum of $116,057.28. The Chief of Engineers approved the decision. Modification No. 14 to the contract was issued, authorizing payment of this sum to plaintiff. Plaintiff signed its acceptance and made no *57 reservations, exceptions, or other claims at that time.[3] Plaintiff executed a final payment estimate in the amount of $116,057.28 under the certification that “The above bill is correct and just * *
From the above resume of the pertinent facts in this case, we conclude that an accord and satisfaction exists, which precludes plaintiff from any further recovery. There are certain elements of the equitable adjustment here that are virtually interchangeable with delay-damage ingredients. In fact, it is evident that much of the extra work came about as a result of the delay. Plaintiff maintains, and we agree, that had a time extension been given in order to rectify the hold up in performance of the contract, plaintiff would not have had to hire extra labor and pay overtime wages. Deciding when delay damages begin and equitable adjustment for extra work ends is not an easy task in this case. One is dependent upon or related to the other. Plaintiff fully realized this fact when it made its claim for equitable-adjustment for extra work. The conclusions of the Conferees Eeport, supra, bears this out. Among other things it concluded that a forty-eight hour work week was used part of the time; that the amount of direct labor was increased to provide for lost time; that an amount of 16% percent was included in the estimates for overtime premium payment, and that overhead included cost of supervision, tools, equipment, supplies and equipment operators. Plaintiff had submitted this information to the Division Engineer, who had considered it, and both parties agreed to the conclusion.. It was upon this conclusion that the Division Engineer recommended the additional payments to plaintiff which were accepted without recourse by plaintiff when it signed Modification No. 14 to the contract.
The sum asked for now in the breach action for delay damages is based upon the same elements considered in the *58 Conferees Report, i.e., overtime and extra labor, and overhead. ' We can reach no other conclusion than that plaintiff at the time it agreed to the equitable adjustment based upon the Conferees Report, also agreed to a settlement of any claim for delay damages. The claim for damages was necessarily considered by both parties as an integral part of the claim for extra work. Conclusion No. 4 of the Report even specifically concerned itself with delay. It stated: “There was no delay in construction due to late delivery of materials or equipment.” [Emphasis added.]
There is a striking similarity between this case and the case of Seeds & Derham v. United States, 92 Ct. Cl. 97 (1940), cert. denied 312 U.S. 697 (1941). In Seeds & Derham, supra, extra work was performed under the contract by plaintiffs. This extra work caused delay damages for increased overhead and labor. Plaintiffs agreed to a contract modification under the changes clause for the additional work. Included in the contract modification was an equitable adjustment for the cost of the extra work. The court found that plaintiffs understood that the additional sum to be paid was intended to cover the entire increase in cost, whether from delay or otherwise. As a result of this finding, plaintiffs were denied recovery of delay damages for breach of contract.
The court stated at p. 110:
It is clear that the claim now presented is an afterthought, and that the plaintiffs understood at the time they agreed to the change order that the sum therein stipulated was to cover the entire increase in cost.
We believe the above quoted language is applicable to plaintiff’s intent in this case when it signed Modification No. 14 to the contract.
Discharge of a claim by accord and satisfaction “means a discharge by the rendering of some performance different from that which was claimed as due and the acceptance of such substituted performance by the claimant as full satisfaction of his claim.” 6 Corbin, Contracts, § 1276 (1962). An accord and satisfaction has been aptly described in the following manner:
*59 The essential elements of an effective accord and satisfaction are proper subject matter, competent parties, meeting of the minds of the parties, and consideration. And its most common pattern is a mutual agreement between the parties in which one pays or performs and the other accepts payment or performance in satisfaction of a claim or demand which is a bona fide dispute.* * *
Nevada Half Moon Mining Co. v. Combined Metals R. Co., 176 F. 2d 73, 76 (10th Cir. 1949), cert. denied 338 U.S. 943 (1950). The above definitions perfectly describe the transactions of the parties here. We therefore conclude that there exists an accord and satisfaction which bars this suit.
The question arises as to how an equitable adjustment may include damages for breach, when only this court has jurisdiction to entertain an action for breach. The answer is not difficult. It is stated in Cannon Construction Co. v. United States, 162 Ct. Cl. 94, 105, 319 F. 2d 173, 179 (1963):
Significantly, plaintiffs have cited us no cases where this court has invalidated, on the ground of lack of authority, any agreement made by the contracting officer in the settlement of a claim for damages for breach of contract. On the contrary, we have held on numerous occasions that compromise settlements were valid and binding on both parties. * * *
It is elementary law that settlements such as the accord and satisfaction entered into here are greatly encouraged.
Plaintiff vehemently opposes defendant’s right to raise the accord and satisfaction defense. It was filed as defendant’s fourth affirmative defense almost four months after the Commissioner’s Opinion and Findings of Fact. Plaintiff maintains that Rules 19(b), 20(b) and 20(h) of the Rules of the court provide that an affirmative defense such as accord and satisfaction must be asserted in the responsive pleading or else waived forever. However, our Rule 22 provides for a liberal amendment of pleadings. We feel that the facts of this case justified allowing defendant to file its fourth affirmative defense.
We conclude as a matter of law that plaintiff is not entitled to recover, and therefore, the petition is dismissed.
*60 FINDINGS 02? FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff’s corf orate identity. Plaintiff is a Georgia corporation engaged in the general construction business, specializing in facilities for the production of power and chemicals, water treatment, and sewage disposal. At times relevant to this controversy its key personnel involved in whole or in part in supervising the performance of the contract in suit were well qualified by educational background and practical experience in comparable undertakings of a substantially smaller size.
2. Patchen and Zimmerman prime contract. On June 16, 1952, the defendant, represented by the Acting District Engineer, U.S. Army Engineer District, Nashville, Tennessee, as contracting officer, entered into a negotiated contract with a partnership by the name of Patchen and Zimmerman, Engineers (hereinafter sometimes refered to as the Architect-Engineer) , for the performance of architect-engineer services in connection with another contract awarded the same month (finding 3, infra) for the rehabilitation construction of the Volunteer Ordnance Works at Chattanooga, Tennessee. The architect-engineer contract provided for the payment of $99,200 for Title I services and $234,850 for Title II services. Title I services related to design work. Title II services ■included, inter alia, the following:
2. Furnish a Besident Engineer and staff of assistants and other personnel to supervise the construction to assure that every part of the work is done in accordance with the approved drawings and specifications and within the areas and boundaries designated for the project. * * *
6. Prepare and/or check, when required by the Contracting Officer, the partial and final construction estimates for payment. Check all change orders and/or supplemental agreements as to necessity and cost justification on lump sum or unit price subcontracts.
*61 3. Skuas see prime contract. On June 27,1952, the defendant, represented by the same Acting District Engineer as contracting officer, entered into a cost-plus-a-fixed-fee construction contract with several contracting firms doing business as joint contractors and co-adventurers under the name of Hiwassee Constructors, Chattanooga, Tennessee, for the “rehabilitation construction of Volunteer Ordnance Works” for an estimated cost of $13,883,000, plus a fixed fee of $189,503. The contract was to be completed July 1, 1953. This contract will hereafter be referred to as the “prime contract”. Hiwassee let a number of subcontracts, including the one in suit.
4. BrocJc da Blevins subcontract.
(a) Article VIII (1) (b) of the prime contract provided that Hiwassee would—
Reduce to writing, unless this provision is waived in writing by the Contracting Officer, every contract in excess of Two Thousand Dollars ($2,000) made by him for the purpose of the work hereunder for services, materials, supplies, machinery, equipment, or for the use thereof; insert therein a provision that such contract is assignable to the Government, make all such contracts in his own name, and not bind or purport to '■ bind the Government or the Contracting Officer thereunder. No purchase in excess of $2,000 shall be made or placed without prior approval of the Contracting Officer.
(b) On October 27, 1952, the prime contractor entered into a “lump sum construction subcontract”[1] with plaintiff for the latter to furnish the materials and perform the work for “rehabilitation of piping, mechanical and electrical equipment — North Acid Area, including the nitric acid, oleum and sellite plants.” The work included all piping, tanks, connections and auxiliary equipment to place the North Acid Area in a completely ready and operating condition. All defective piping was to be replaced. The estimated amount to be paid for the work was $1,234,557.89, *62 and a comprehensive unit price schedule on estimated quantities of numerous items was incorporated. The total amount of the subcontract as increased by change. orders was $2,272,156.16.
(c) The subcontract bound the plaintiff to those parts of the prime contract applicable to the plaintiff, and to that extent the prime contract was incorporated by reference in the subcontract. The subcontract also contained standard clauses covering termination for default, disputes (appeal from contracting officer to Chief of Engineers), changes, and government-furnished property. Where relevant particular provisions will be quoted in subsequent findings. Neither the prime contract nor the subcontract contained provisions for suspension of work.
(d) The subcontract required the work to be completed within 130 days after October 27, 1952, thus fixing March 6, 1953 as the date for completion. Liquidated damages of $200 were to be charged plaintiff for each day of delay in completion. By change orders the subcontract time was extended 165 days, advancing the completion date to August 18, 1953. The subcontract was completed July 3, 1953.
5. Prebid site investigation.
(a) Paragraph 1-06 of the subcontract specifications provided as follows:
Sira Investigation and Bepegsentations :
The Contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, handling and storage of materials, availability of labor, the character of equipment and facilities needed preliminary to and during prosecution of the work and all other matters which can in any way affect the work or the cost thereto under this contract. Any failure by the Contractor to acquaint himself with all the available information concerning these conditions will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Prime Contractor assumes no responsibility for any understanding or representations not already incorporated in these Specifications, made by any of his agents during, or prior to, the negotiation and execution of this contract, unless (1) *63 such understanding or representations are expressly stated in the contract and (2) the contract expressly provides that responsibility therefor is assumed by the Prime Contractor. Representations made, but not so expressly stated, and for which liability is not expressly assumed by the Prime Contractor in the contract, shall be deemed only for information of the Contractor and subject to confirmation by him, and the Prime Contractor will not be liable or responsible therefor.
. (b) Section 2 of the special conditions of the subcontract specifications at paragraph 2-01 provided in part as follows:
The nature of the work to be done is such that it is necessary that bidders visit the site of the work for the purpose of thoroughly familiarizing themselves with ' all local conditions peculiar to the work covered by these Specifications. Bidders should make arrangements for such visits through the Prime Contractor.
(c) The specifications for the subcontract in suit wore issued September 15, 1952. Bids were originally set for opening October 14, 1952, but the time was extended to October 22,1952. Prior to and during the bid period plaintiff was performing a subcontract pertaining to the powerhouse at the Volunteer Ordnance Works, one-half mile from the site of the subcontract in suit, and plaintiff’s manager of the powerhouse subcontract, a Mr. Shrader, was generally familiar with the North Acid Area, which occupied several hundred acres. During the bid period Mr. Shrader spent his weekends and other spare time examining the work-site conditions to determine the extent of the work to be done. Another of plaintiff’s engineers, a Mr. Jones, who was subsequently manager of the subcontract project, investigated conditions at the worksite fulltime during the bidding period. Shrader and Jones carefully checked the field conditions at the worksite in detail against the specifications and drawings.
(d) Prospective bidders, including representatives of plaintiff company, were taken on a tour of the site during the bidding period by representatives of the defendant and the prime contractor. The Volunteer Ordnance Works had been built during World War II but had been only about half completed by the end of the war. It had then been *64 “mothballed” until the Korean hostilities starting in 1951 created an urgent need for TNT and brought about a requirement for the rapid rehabilitation and completion of the plant. The North Acid Area had never been in full operation, although some parts of it were operable. The drawings furnished to the bidders represented the condition of the plant as it was to have been constructed in World War II. They had not been corrected to show work which had not been completed under the original contract. Thus the drawings were primarily useful as a guide to locate the facilities described in the specifications drawn by the defendant covering the work under Hiwassee’s prime contract and the subcontracts let thereunder, including plaintiff’s subcontract in suit, but did not purport to represent the work proposed to be done. The specifications had been hurriedly prepared by defendant-and did not adequately cover the entire rehabilitation work which was to be done. Frequently the specifications called for work for which no provision appeared in the unit price schedule. These inadequacies were obvious to plaintiff and other prospective bidders. They were told that there would be modifications to the contract through field directives and change orders which would be issued promptly on the site as the occasion arose. It was also stated that change orders would be issued to cover not only those items of work which were obviously omitted in the specifications, but also to cover work done to correct conditions revealed as the work progressed.
(e) Thus the proposed subcontract covering the North Acid Area was principally for rehabilitation of certain existing facilities, and to a lesser extent for completion of others which had not been completed during the performance of the original construction contract in World War II. A bidder could not look at the drawings and tell what was actually complete. Instead, he had to consult the drawings as he examined the facilities in the area in detail to see whether particular facilities were or were not in place. While many deviations were readily discernible, many others could be detected only in the process of dismantling during contract performance. Bidders were instructed to base their *65 bids only on tbe work called for in the specifications, and were assured that after the job was awarded orders would be issued to the successful subcontractor for any additional work.
6. Plaintiff's bid preparation. Plaintiff’s bid estimate was prepared largely by its engineers Shrader and Jones as stated in the preceding finding. They concluded that practically all of the work to be done involved labor and equipment costs and that only a small percentage of material was to be supplied by the bidder. For this reason they based plaintiff’s bid on a flat rate of $6.50 per hour of direct labor. This rate included not only labor wages but also incidental and related costs for material, equipment, supervision, overhead, profit, and profit on the third tier subcontractor’s manhour labor. The plaintiff’s bid was based on an estimate that the job would require 125,000 to 150,000 manhours of direct labor. Four dollars of the $6.50 base rate was for actual labor costs and between 50 and 75 cents was for equipment costs. This is to be considered as the contractor’s rule-of-thumb basis for its bid estimate, and is not to be taken as a reflection of the division of actual costs ultimately experienced.
7. Source and inadequacies of specifications. Under its prime contract with the defendant, the Architect-Engineer (finding 2, supra) was to prepare technical specifications for the contract to rehabilitate the Volunteer Ordnance Works. In doing so the Architect-Engineer did not make a detailed examination of the site, but based the specifications on a “scope of work” which had previously been prepared jointly by the Corps of Engineers and the Atlas Powder Company, which latter company had been engaged to take over as the operating contractor after completion of the contract. The specifications as prepared by the Architect-Engineer were thus merely a codification into the form of specifications of a series of documents furnished by the Corps of Engineers constituting the “scope of work”, and the Architect-Engineer was not authorized or required to determine the adequacy of the scope of work. It was admitted by the Architect-Engineer that the scope of work provided in the specifications was not adequate to cover many items of work which were readily apparent and were subsequently included in change orders. *66 The quantity and scope of modifications ultimately issued were greatly in excess of those anticipated. At the outset of subcontract performance and frequently thereafter the plaintiff complained to representatives of the prime contractor about the obvious omissions of the specifications and design deficiencies, and sought immediate corrective action without avail. While these complaints do not appear in the record in written form, the testimony of plaintiff’s witnesses was convincing and the defendant did not call representatives of the prime contractor as witnesses in rebuttal.
8. Summary description of present claim.
(a) Plaintiff’s basic claims are: .
(1) Delays by the defendant increased its costs for equipment, overtime, and overhead.
(2) Defendant’s refusal until after the expiration of the original performance period to grant plaintiff time extensions, coupled with its insistence throughout the original performance period that plaintiff finish on time despite delays, caused plaintiff to incur greatly increased overtime for which it was not reimbursed.
(b) The delays of which plaintiff complains fall into two categories totaling 120 days. The first category amounts to a claimed 50 days and consists of specific acts and omissions set forth in findings 9 through 19. The second category amounts to a claimed 70 days and consists of unreasonable delays in issuing field directives, as described in findings 20 through 22.[2]
Specific Delays AgoregatiNG 50 Days
9. In general.
(a) These alleged delays aggregating 50 days consist of or relate to lack of utilities (telephone service, electric power, water), late arrival of manufacturers’ representatives, removal and furnishing of brick, supply of defective mortar, removal of ammonia piping, furnishing special “haul and install” materials, and furnishing drawings. Plaintiff has used a formula for determining the delay to the en *67 tire subcontract caused by the delay to a specific component thereof. Where, for example, the completion of 25 percent of a specific component of the entire subcontract is delayed for a known 20 days, the entire subcontract is determined to have been delayed by 20 days X 25 percent X
(Subcontract price for the specific component)
(total subcontract price)
Expressed in another way, the formula is as follows:
Days of delay to the specific component X percent of the specific component that was subjected to delay X (subcontract price for the specific component)
(total subcontract price) ~
days of delay to the entire subcontract.
Hypothetically put, assuming that the total subcontract price is $100,000 and that 25 percent of a specific component unit is delayed for 20 days, and that the subcontract price for the specific component is $10,000, the delay to the entire subcontract is one-half day, computed as follows:
20 days x 25 percent X qqq)= .5 days
(b) As to many of the delays of which the plaintiff complains the defendant’s resident engineer testified at trial that he had received no complaints from the contractor, and that when he did corrective action was taken within reasonable time. However, the subcontract was being administered by the prime contractor and plaintiff’s complaints were made to the prime contractor. No representative of the prime contractor appeared at trial to refute the testimony of plaintiff’s witnesses that oral complaints had been made to the prime contractor prior to the written complaints which are in the record.
10. Telephone service.
(a) The specifications provided that “Seasonable and necessary telephone facilities will be furnished by the contracting officer at no cost to the contractor * * * as an obligation under this contract.”
*68 (b) On November 9,1952, the plaintiff advised the prime contractor that, despite repeated complaints, no telephone facilities had been furnished, that because of it subcontract operations had been seriously curtailed and the field office rendered virtually inoperative, and that unless conditions were remedied immediately the completion date and cost of performance would be affected.
(c) On November 18, 1952, the prime contractor informed plaintiff that it understood that telephone service had been installed.
(d) On February 3, 1953, the plaintiff advised the prime contractor that “we and other contractors in the area are having great difficulties with the telephone communications. We, in the North Acid Area, have been practically without service due to this entirely inadequate facilities there at V.O.W.”
(e) The defendant’s resident engineer asserted at trial that he had received no such complaints from the contractor, that, however, he had heard they did not have telephone service during the first several weeks, that lack of telephone service would be a handicap, but that plaintiff’s real handicap at that time was its inability to obtain 12 pipefitters.
(f) The plaintiff endeavored to overcome the lack of telephone service by use of portable telephones in its vehicles, but this was not successful.
(g) Using the formula described in finding 9, sufra, the delays in providing adequate telephone service delayed an estimated 15 percent of the entire contract during the 21 day period from October 27 to November 18,1952, thus delaying the entire contract work as a whole 3.15 days (15 percent X 21 days). There is no way to verify the accuracy of the 15 percent estimate, but the importance of communications during the early stages of contract performance provides a reasonable basis for the estimate.
11. Electric power.
(a) Paragraph 1-05 of the specifications provides as follows:
a. Water Supply and Electric Power in reasonable quantities will be furnished by the Prime Contractor as required for the Contractor to execute the work described *69 in these Specifications. The Contractor shall furnish his own wiring from the existing electric power source designated by the Contracting Officer.
(b) On November 13,1952, the plaintiff advised the prime contractor by letter that there had been no available source of 220 volt electricity in the North Acid Area since the beginning of the job and this lack had seriously curtailed its welding activities. On the same day the prime contractor promised to designate the nearest source of supply for the plaintiff’s temporary construction lines if the plaintiff would specify the particular location where power was needed. The prime contractor followed this up on November 17, 1952 by advising plaintiff that 220 volt electrical service would be made available by November 18 at the transformer bank centrally located in the North Acid Area.
(c) Lack of a 220 volt power source prevented plaintiff from operating its electrically operated equipment such as air compressors and welding machines. Plaintiff endeavored to offset the delays thus occasioned by means of hiring all of the gas-driven equipment which was locally available. Using the formula described in finding 9, supra, the delays in providing adequate electric power delayed an estimated 15 percent of the entire contract during the 21 day period from October 27 to November 18, 1952, thus delaying the entire contract work as a whole 3.15 days (15 percent X 21 days). Again as in the case of the telephone service claim (finding 10), there is no way to verify the accuracy of the 15 percent estimate, but the estimate is considered to be reasonable.
12. Tardy manufacturers’ representatives.
(a) Specifications. Paragraph 2-06 of the specifications provided as follows:
The Contracting Officer will provide the services of representatives from the companies listed below to furnish advice on the rehabilitation work on the equipment furnished by each. It shall be the duty of the Contractor to cooperate with these representatives to insure proper rehabilitation of the equipment in accordance with requirements of the manufacturers.
Air Compressors-Ingersoll-Rand Co., * * *.
Mantius Sulphuric Acid Mantius Engineering Co., Division of Concentrators. National Lead, * * *,
*70 (b) National Lead representative.
(1) Certain Mantius Sulphuric Acid Concentrators contained in buildings 304-1 and 308-1 in the North Acid Area had been manufactured by the National Lead Company and required extensive rehabilitation under plaintiff’s subcontract, including installation of a large number of specially designed parts which had to be fabricated by the original manufacturer from designs in the latter’s possession. Because the Mantius units were critical in the overall subcontract construction schedule and procurement of the specially designed missing parts required expediting to be available in time, in September 1952 (a month prior to the issuance of the subcontract in suit) the prime contractor, with the advice and consent of the defendant and the Architect-Engineer, secured proposals from and issued orders to the National Lead Company for the necessary parts and for the consulting services of a field erection supervisor from the National Lead Company to assist plaintiff in the supervision of construction during the rehabilitation of the Mantius units.
(2) It was the plaintiff’s responsibility to notify the prime contractor of the date when it would need the services of the National Lead Company representative, and normally a month’s advance notice would be required. No such notice was given by plaintiff to the prime contractor until the former’s letter of December 18,1952, requesting the National Lead representative to be on the job ready to start work on J anuary 5, 1953. This notice was in response to the prime contractor’s letter to plaintiff of December 15,1952, reminding it that notice would be required and suggesting that the representative should report not later than J anuary 1,1953.[3] The National Lead Company representative actually appeared on the job on January 12,1953, but was not ready to work until January 20 when a special flanging tool was available for the first time. It was apparently the responsibility of the National Lead Company and not the plaintiff to provide the special tool, and until it was provided effective work on the Mantius units could not commence. Although *71 the plaintiff contends that it was delayed on this part of the work for the period from January 5 to January 20, 1953, it would appear reasonable to conclude that the plaintiff itself was responsible for the delay to January 12, when the National Lead Company representative first appeared, because of the plaintiff’s tardiness in giving the prime contractor sufficient notice. However, the defendant should be responsible for the 8-day delay between January 12, when the National Lead Company representative reported to the job, and January 20, when the special tool arrived and permitted the work to commence, for the mere presence of the representative on the job would not contribute to its progress if he was not equipped to work.
(3) The total subcontract price of all mechanical work in buildings 30N1 and 308-1 ($226,114) was 20 percent of the price for all mechanical work in the total subcontract ($1,124,000). Although plaintiff was able to and did perform 25 percent of the work in buildings 304-1 and 308-1 without impedence from the late arival of the National Lead Company representative, it was delayed 8 days (January 12 to 20,1953) in the remaining 75 percent of the work in these two buildings for the reason given. Using the formula in finding 9 this delayed the subcontract work as a whole 1.2 days (20 percent x 75 percent x 8 days).
(c) Ingersoll-Band representative.
(1) One of the first jobs which plaintiff commenced in the performance of the subcontract was to degrease the air compressors in building No. 301-1, the compressor house, which was to be followed by reassembly of the compressors. This work was required by the specifications to be done under the supervision of a representative of the Ingersoll-Band Company. Although the latter company was notified in time to have its representative present without delay, it did not do so and plaintiff proceeded to perform the degreasing-operation without his presence until its completion on or about November 19,1952. Despite the diligent and repeated efforts of the prime contractor the Ingersoll-Band Company broke several promises to have its representative present, and after November 19,1952, plaintiff was unable to proceed with *72 the reassembly of the compressors, thus disrupting its re-habilitations schedule, exposing the degreased and disassembled compressors to dirt and rust, idling the crew of men engaged for the job, and threatening a delay to the entire project. Finally, on December 9, 1952, the prime contractor adopted the plaintiff’s suggestion of December 3,1952, and authorized the plaintiff to proceed with the reassembly of the compressors without the presence of the Ingersoll-Band representative. The plaintiff was delayed 20 days in this phase of the job, from November 19 to December 9,1952.
(2) The total subcontract price of all work in building No. 300-1 ($61,555) was 5.4 percent of the price for all mechanical work in the total subcontract ($1,124,000). Although plaintiff was able to and did perform 20 percent of the work in building No. 300-1 without impedence from the absence of the Ingersoll-Band representative, it was delayed 20 days (November 19 to December 9,1952) in the remaining 80 percent of the work in building No. 300-1 for the reason given. Using the formula in finding 9 this delayed the subcontract work as a whole .9 of a day (80 percent x 5.4 percent x 20 days).
(d) Foster-Wheeler representative.
(1) Paragraph 2-06 of the subcontract specifications, part of which is quoted in paragraph (a) of finding 12, supra, provided as follows:
The Contractor [meaning plaintiff] shall secure, at no expense to the Prime Contractor, the services of such other representatives of manufacturers of equipment to be rehabilitated, as may be required for the Contractor to properly perform the work covered by these Specifications.
(2) The Foster-Wheeler Corporation had installed, in 1945, the waste heat boiler in the oleum plant, building No. 307-1A. Plaintiff was to degrease and rehabilitate the said boiler, and the prime contractor imposed the requirement that a Foster-Wheeler representative be present to supervise the work. As early as November 13, 1952, the plaintiff advised the prime contractor that it would want the Foster-Wheeler representative on hand the following week to avoid *73 delays similar to those recited above in connection with the Ingersoll-Band representative. The prime contractor replied immediately to the effect that, although it was plaintiff’s responsibility under the specifications to provide the Foster-Wheeler representative, it would help the plaintiff in securing such services if requested. Although plaintiff was evidently ready as early as November 20 to start work on the waste heat boiler, as of December 23, 1952, it was under instructions from the Architect-Engineer not to even degrease the boiler unless a Foster-Wheeler representative was present. This requirement was imposed with the concurrence of the Atlas Powder Company, which company had contracted to operate the Volunteer Ordnance Works after its rehabilitation. On December 23, 1952, plaintiff protested to the prime contractor that the delay would seriously affect its schedule for boilermakers work in the oleum area, and said that it was fully qualified to build and erect boilers of any size without supervision, a fact with which the Foster-Wheeler Corporation allegedly agreed. It no doubt was qualified. On December 29, 1952, the Architect-Engineer advised the prime contractor that the defendant’s resident engineer had previously approved letting plaintiff proceed with the waste heat boiler work without the Foster-Wheeler representative being present, provided plaintiff would correct at its own expense any such work later found to be improperly installed, and would continue in its efforts to get a Foster-Wheeler representative on the job. Presumably the plaintiff proceeded with the work on the waste heat boiler from December 29, 1952, onwards on a temporary waiver basis, but as of January 20, 1953 (when the Foster-Wheeler representative failed to appear on the job as promised) the plaintiff was still requesting the prime contractor to waive the specifications and proceed with the final test of the equipment under the supervision of state inspectors. The Foster-Wheeler representative did not arrive on the job until about two weeks after plaintiff completed its work on the waste heat boiler.
(3) The plaintiff contends that during the 29-day period from December 23,1952, to January 20,1953, the waste heat *74 boiler work in building No. S07-1A was delayed due to the defendant’s refusal to dispense with the specification requirement that a representative of Foster-Wheeler Corporation be present. Using the formula in finding 9, sufra, this 29-day delay is reduced to a delay of .6 of one day to the subcontract as a whole. Limiting the claim to the 29-day period mentioned, it would appear from the record that in that interim the plaintiff was proceeding with the boiler work under a temporary waiver of the specification requirement, and therefore was not delayed, although it had been prohibited from working on the boiler during most of the period preceding the claim period. Since no delay claim is made by plaintiff for any period prior to December 29, 1952, it is unnecessary to determine whether the defendant was liable for any delays occurring prior to December 29, 1952.
13. Tardy brick removal.
(a) The critical nature of buildings Nos. 304-1 and 308-1, housing the Mantius sulphuric acid concentrators, has been described in paragraph (b) of finding 12, sufra, in connection with the late arrival of the representative from the National Lead Company. On October 22, 1952, five days before the formal award of the contract when plaintiff learned it was the low bidder, it moved to the project a crane and removed the lid and piping above the vats and vessels of the Mantius units so that the prime contractor, whose responsibility it was, could remove the old brick without delay. By October 27,1952, the units were ready for the prime contractor to remove the old brickwork, an operation which plaintiff contends could have been done in three days. It is not known when the prime contractor commenced the removal of the old brickwork, but it was not completed until November 16, 'and the plaintiff contends that this delayed subsequent operations a net amount of at least 15 days. The specifications covering the buildings in question disclose that the old brickwork was to be removed as one of the preliminary operations in rehabilitating the various components of the Mantius units, such as feed tanks, concentrators and cooling tanks, and reasonably infer that a number of other required procedures as to the Mantius units could not be performed until the old brickwork was removed. Defendant *75 correctly states that the removal of the old brickwork did not delay the replacement of new bricks, but it did delay many intervening operations. If the plaintiff had commenced performance of its subcontract on October 27, 1952, the date of its award, and had taken five days to ready the units for removal of the old brickwork (as it did from October 22 to 27), and if the prime contractor had acted promptly and taken three days to remove the old brickwork, the removal would have been completed on or about November 5 instead of November 16, 1952, thus implying a theoretical delay of 11 days, which should be reduced to an estimated chargeable delay of 9 days to allow a reasonable margin of error.
(b) The total subcontract price of all mechanical work in buildings Nos. 304-1 and 308-1 ($226,114) was 20 percent of the price for all mechanical work in the total subcontract ($1,124,000). Although plaintiff was able to and did perform 25 percent of the work in buildings Nos. 304-1 and 308-1 without impedance from the delay of the prime contractor in removing the old brickwork, it was delayed 9 days (November 7 to 16,1952) in the remaining 75 percent of the work in these two buildings for the reason given. Using the formula in finding 9 this delayed the subcontract work as a whole 1.35 days (20 percent x 75 percent x 9 days). The delay occurred at a different time period than that described in finding 12 relating to the late arrival of the National Lead Company representative, and they did not overlap.
14. Tardy brick deliveries.
(a) The specifications for the Mantius units in buildings Nos. 304 — 1 and 308-1 required plaintiff to lead-line the feed tanks, concentrators and cooling tanks and then to install in those components new acid bricks supplied by the prime contractor to replace the old brickwork removed by the prime contractor. These operations were to be done after the completion of other rehabilitation items set forth in the specifications, and so were timed for the later stages of the procedures for the Mantius units. By letter of November 13, 1952, the prime contractor, responding to plaintiff’s inquiry of the same date, advised the latter that the acid brick was being expedited. The supplier of the acid brick promised on *76 November 17 to deliver stages January 2,1953 (end of week of December 29, 1952). In the meantime the work on the Mantius units in buildings Nos. 304: — 1 and 308-1 was delayed for other reasons, and the acid brick did not arrive during the promised period. On January 12, 1953, the prime contractor advised plaintiff that, “as things exist in the field at the present time” (presumably referring to delays), plaintiff would not be ready until January 26, 1953, to start brickwork on the concentrators (which were components of the Mantius units) and could not be completed before March 9, after which a predicted two to six more weeks of work would be necessary before the units would be in operating condition. This time prospectus was based on a normal workweek, and it was cited by the prime contractor as a basis for insisting that plaintiff accelerate its workweek in order to meet the original March 7, 1953 target date for readiness of the Mantius units for operation. To this the plaintiff replied that it Avould endeavor to meet the original brickwork schedule, which the prime contractor had had since November 1952, but pointed out that the prime contractor’s delay in dismantling the old brick had held up the schedule on the Mantius units. On January 26, 1953, the plaintiff advised the prime contractor that the bricks to lay in the feed tanks and cooling tubs of the Mantius units had not yet been delivered, and were long past due. Citing again the prime contractor’s delays in dismantling the old brick and in getting the representative of the National Lead Company on the job, the plaintiff said that it had had to put its bricklayers on a 70-hour-per-week basis at a cost of about $20,000 in order to make up for delays caused by others, and even so the job would run beyond the completion date.
(b) Delivery of the bricks for the feed tubs in the Mantius units was finally completed on February 3,1953. The plaintiff claimed that this had stopped work on the feed tubs for almost three weeks and on the acid coolers for several days, and that its scheduled operations for the Mantius units had been disrupted and it had had to lay men off. Because of this the plaintiff on February 3, 1953, requested a 30-day *77 time extension from the prime contractor. On February 10 the prime contractor disagreed with plaintiff’s contentions as to responsibility for and extent of the delays to the Mantius units, conceding only a delay of 5 days due to late delivery of the brick and 2 days due to late delivery of the special flange tool for use of the National Lead Company representative in connection with the lead work. The prime contractor granted a time extension of 15 days solely for the additional work under field directives, and not for the other causes assigned by plaintiff. The plaintiff took issue with the prime contractor’s statements, renewing its contention as to the delays and asserting that the concentrators were closer to completion than charged by the prime contractor. Defendant’s contention at trial that plaintiff would not have been ready to use the brick earlier than its actual delivery is supported only by the vague memory of the defendant’s resident engineer, and not corroborated otherwise.
(c) There is some confusion on the point of late delivery of the bricks. The plaintiff concedes that the bricks could not have been used on building No. 304-1 prior to January 20, 1953, when the representative of the National Lead Company was on the job and ready to do the lead work, which had to be done before the new bricks could be laid. Circumstances infer that the Mantius units in building No. 304-1 were not ready for brickwork to be done until January 26, 1953, presumably because the lead work was in progress and incomplete until then. Circumstances also justify the assumption that, although delivery of the bricks was not completed until February 3, 1953, there were some deliveries shortly prior to that time. Plaintiff claims that late delivery of bricks affected only building No. 304-1. It is thus found, in accord with the prime contractor’s letter of February 10,1953, that the work in building No. 304 — 1 was delayed 5 days due to the late delivery of bricks, and not 10 days as plaintiff claims.
(d) The total subcontract price of the work affected at building No. 304 — 1 by the late delivery of brick was $29,707, which is 2.65 percent of the entire subcontract price for all mechanical work of $1,124,000. Using the formula in find *78 ing 9, supra, days (2,65 percent x 5 days).
(e) Article V binding on the subcontract in suit stated in pertinent part that the Government would not be liable for damages by reason of delay in the furnishing of materials.
15. Defective mortar. for installation by plaintiff in buildings Nos. 301 — 1, 307-1 and 308-lA, the laying of the bricks was delayed still further by reason of defective mortar supplied by the prime contractor. However, this claim is supported only by the hearsay testimony of plaintiff’s president, and not by contemporaneous documentary complaints or by specific recollection of plaintiff’s supervisory personnel. Thus the claim as to defective mortar fails for lack of acceptable proof.
16. Phantom water lines.
(a) Paragraph 1-05 of the subcontract specifications provides that the prime contractor shall provide water in reasonable quantities as required. The contract drawings supplied the plaintiff showed an underground water line running through the North Acid Area. It was known, however, that the drawings showed the project as it would have been completed in 1945 had the original construction contract not been terminated halfway through. Thus the drawings did not represent nor were they intended to represent the work to be done, nor to depict accurately the work in place, but were merely a locational guide to the existing and intended facilities and installations. Some of the items which were not completed in 1945 were visibly incomplete, and the incomplete status of others could be determined only as the rehabilitation work progressed and revealed incomplete details. The parties knew that only certain portions of the original contract construction work had been completed to the point of being operable. This situation is described in paragraphs (d) and (e) of finding 5, supra.
(b) During a prebid tour of the project by plaintiff’s representatives accompanied by a representative of the prime contractor, the latter is said to have stated that the water system was in place, and this statement found strong cor- *79 pings protruding above the ground which led to the natural assumption on plaintiff’s part that they were connected with existing water lines. The Architect-Engineer’s representative testified at trial that the drawings which were supposed to show the underground location of the water lines were in error, and that a change order was necessary to install water lines where they were supposed to be. Plaintiff’s bid was predicated on the assumption that the water lines were in place and that a water supply would be available when work was commenced.
(c) In early November 1952, when the need first arose for a supply of water in connection with the testing of certain equipment, representatives of the plaintiff and the prime contractor attempted to turn the water system on, only to find that water flowed through pipes in the portion of the North Acid Area that had been in operation during World War II, but not in other portions of the area because there were no pipes. The plaintiff immediately installed a temporary two-inch water line above ground surface to the oleum-sellite area which enabled it to perform small jobs of cleaning and testing but was inadequate for operating its power equipment and for other normal uses.
(d) There was some initial confusion as to who would be ordered to install the needed water lines. After considerable delay a field directive was issued to plaintiff on December 10 to install the water pipe lines in trenches to be excavated by the prime contractor. The prime contractor performed the excavating job in such a desultory and inefficient maimer that after two weeks the plaintiff suggested that it be ordered to take over the trench excavation. The necessary orders were promptly issued and shortly thereafter, on January 2, 1953, the plaintiff commenced the trench excavation.
(e) Due to the proximity of the water lines to existing structures the trenches had to be excavated by hand. Difficulty was experienced in locating the existing water lines to which the new pipes were to be connected. Some of the trenches were 12 feet deep and the nature of the material required a slope of 1 on 1 (i.e., one foot horizontally for each vertical foot, resulting in trenches as wide as 25 to 30 feet *80 at the top. The was was affected by cold weather and muddy conditions. The trenches paralleled key roadways through the area and effectively prevented their use for protracted periods. This prevented the plaintiff from using heavy equipment for installing materials and equipment in the affected areas.
(f) Plaintiff contends that 39 percent of the contract work in the oleum-sellite and adjacent areas representing 52 percent ($540,000) of the total subcontract price for mechanical work ($1,124,000) was blocked for the period of 130 days from October 27, 1952 to May 22,1953, when the water line installation was complete. The 39 percent figure is plaintiff’s estimate based on a study of the specifications and plans. There is no way to verify or refute its accuracy. However, it is reasonable to conclude that the period of disruption commenced no earlier than 15 days after the award of the subcontract on October 27, 1952, and substantially ended for an equal time prior to the completion of the water line installation, thus curtailing 30 days from the 130 days of disruption claimed by the plaintiff. Using the formula described in finding 9, supra, the disruptions delayed the project as a whole 20.28 days (52 percent X 39 percent X 100 days).
(g) Plaintiff’s costs in connection with installing the water lines were covered by field directive M-64, and later included in a change order. A dispute arose later as to the reasonable labor costs to be allowed, but the plaintiff at no time prior to filing the instant suit made a claim for delay-damages based on the facts given in this finding.
17. Ammonia pipmg mistake.
(a) Building No. 301-1 contains 14 large ammonia storage and burning tanks, and a large quantity of related piping and equipment. The subcontract required plaintiff to clean and test the tanks and rehabilitate the piping and pumps. The ammonia system was an ultra-clean system. Each piece had to be cleaned separately, and after the piping was assembled the entire system had to be cleaned as a unit.
(b) After substantial completion of the plaintiff’s rehabilitation work early in the performance period, except for the installation of lead valves and piping materials on *81 order and the cleaning of the lines (ordered by field directive just prior to these events, but not started), someone decided that there should be a metal structure over the tanks, and the prime contractor purchased such a structure. On or about February 24, 1953, a subcontractor under the prime contractor, at the latter’s direction, removed all but a few pieces of the extensive piping from the system, apparently to facilitate the erection of the steel shelter although the removal was not necessary for this purpose. The piping was removed in a negligent manner and was seriously damaged beyond reuse. It was indiscriminately thrown down upon the muddy ground. Insulation on the tanks had been damaged. The plaintiff registered complaints with the prime contractor about the lack of care used in removing the piping, which had served to nullify much of the work which plaintiff had already performed, and had made the proposed completion date of building No. 301-1 impossible to meet.
(c) It was recognized by the defendant that the removal of the piping had been a serious error, and the plaintiff was ordered by field directive to replace the piping using all available pipe fitters on a T-day around-the-clock basis. No time extension was provided in the order. The haste was occasioned by the fact that ammonia en route to the installation had to be stored in the ammonia tanks upon arrival. There was some delay in obtaining special valves and flanges for restoring the piping. In order to comply with the order the plaintiff had to employ for 12 days all of its pipefitters— some 200 — representing 75 percent of plaintiff’s total craft labor, thus disrupting plaintiff’s subcontract schedule and delaying work sequences elsewhere.
(d) Using a modification of the formula in finding 9, supra, it is computed that plaintiff was delayed 9 days in performing the contract as a whole because of the pipe removal incident (75 percent X 12 days). It was paid for the cost of labor and materials involved in the pipe replacement and was given a time extension, but neither asked for at the time nor was paid damages for delays.
18. “Haul and install” materials issue.
*82 (a) Upon tbe termination of the original construction contract in 1945, when the Volunteer Ordnance Works was only half completed, the original contractor left in storage in warehouses on the premises large quantities of materials which had been assembled for completion of the job. These diverse materials were still in storage at the time of the award of the subcontract in suit, and the subcontract specifications provided that the plaintiff would haul particular items out of storage and install them where called for elsewhere in the specifications at numerous locations. The plaintiff used these materials as the need arose and without interference until about January or February 1953, when the Atlas Powder Company, which had been hired to operate the plant when the rehabilitation was complete, decided that it wanted to keep all of the remaining stored materials intact for future maintenance requirements. Thereupon the prime contractor prohibited plaintiff from using any more of the materials from the warehouses. Many of the items of material were urgently needed by plaintiff and were of special manufacture. The plaintiff complained to the prime contractor and the Architect-Engineer about the order, to no avail, and its progress in the work is alleged to have been delayed by having to procure the materials elsewhere, which it was given orders to do and was paid for. Plaintiff made no claim administratively for the damages due to the delays occasioned by the facts cited in this finding, and states in its requested findings here that the delays overlapped other delays for which claim is made specifically. Thus it is not relied on as a separate basis of recovery here, but is cited merely to reflect general conditions which affected plaintiff’s performance of the subcontract.
(b) The plaintiff’s contention that it was delayed by the circumstances related in the immediate preceding paragraph is in sharp conflict with a subsequent agreement by plaintiff that there was no delay to its performance attributable to late delivery of materials by the Government. This statement was made in a Conferees Report in May 1955, which formulated the basis for the administrative payment of plaintiff’s outstanding claims. The facts as to this are pre- *83 seixted in finding 31, infra, particularly paragraph (c) thereof.
(c) In any event, Article V of the prime contract, which was equally binding on the subcontract in suit, stated in pertinent part that the Government would not be liable for damages by reason of delay in the furnishing of materials.
19. Delayed drawings. The subcontract specifications required the defendant to supply plaintiff from time to time with drawings “in explanation of details or minor modifications, including such minor modifications as the Contracting Officer may consider necessary to meet conditions found during prosecution of the work.” In some instances the defendant either failed to provide the drawings or provided them late, thus delaying the plaintiff directly in those parts of the work to which the drawings related, and indirectly in upsetting its schedule of operations generally. These delays, which cannot be measured, are conceded by plaintiff to overlap other delays for which specific claim is made. The reference to the delay here is to portray general conditions which affected plaintiff’s progress, rather than to provide the basis for a separate delay claim.
Delays IN IssuiNG Field Directives
20. /Subcontract provisions. The subcontract specifications designated the Architect-Engineer as the engineer representative of the contracting officer, with authority to inspect the subcontractor’s work for quality and compliance. But he was affirmatively precluded from making changes or modifications to the subcontract, or directing additional work, or waiving performance. The subcontract authorized the prime contractor to make changes by written orders, subject to approval by the contracting officer.
21. Field directive procedure. The volume of extra work requiring the issuance of field directives far exceeded expectations. The Architect-Engineer had expected modifications totaling about 20 percent of the base subcontract in dollar volume, instead of the 100 percent figure which materialized. Soon after the commencement of subcontract performance it became obvious that the prime contractor was *84 not adequately staffed to handle the issuance of field directives and the entailed duties such as computing pay estimates, etc. A temporary expedient was adopted informally to relieve the prime contractor of the field directive burden, whereby the representative of the Architect-Engineer would issue the plaintiff’s representative on the jobsite field directives written in longhand to permit the plaintiff to proceed with changes prior to issuance of formal orders. The Architect-Engineer’s contract price was increased to pay for the additional help which these new duties imposed. The field directives thus issued had no enforceable legal status as such, since they violated the express terms of the subcontract, but the procedure was acquiesced in by the contracting officer. After the issuance of a field directive by the Architect-Engineer he would prepare a confirming letter of authority for signature by the resident engineer representing the contracting officer. The letter of authority was the official authorization to do the extra work, but it was understood that the plaintiff was safe in going ahead when the field directive was first issued. The related letters of authority were issued promptly. The amount to be paid under a field directive and the confirming letter of authority were left for later determination. The plaintiff was to submit a proposal showing a complete cost breakdown for labor, material, overhead and profit involved in each field directive. The proposal was then forwarded to the resident engineer together with a copy of the prime contractor’s estimate. Change orders were issued periodically specifying the work done under an accumulated group of field directives and providing payment therefor. The procedure as described above seems to have been a reasonable accommodation to the urgency involved in readying the plant for use of its product in the Korean War.
22, Timeliness of field directives.
(a) As stated in finding 5, supra, all parties concerned recognized many omissions in the specifications during the prebid period and it was understood that field directives would be issued promptly as needed in the course of performance to authorize the omitted work. After award of the sub *85 contract the plaintiff urged the prime contractor, without avail, to make a detailed examination of the worksite so that orders could be issued without delay to perform those items of work which were visibly necessary but not included in the specifications.
(b) In the course of the following paragraphs repeated reference will be made as a matter of convenience to “hidden” and “nonhidden” work covered by field directives. “Hidden” work refers to work items whose need could only be discovered as the job progressed and various structures and installations were opened and disassembled for cleaning and rehabilitation. “Nonhidden” work refers to work items which should have been included in the original specifications because their need was obvious prior to the award of the subcontract.
(c) The plaintiff contends in general that the defendant delayed the issuance of field directives and haggled unnecessarily over whether certain work ordered to be done by the defendant’s representatives was included in the original contract or was in addition to it. The plaintiff contends in particular that the defendant’s failure to include in the original specifications a quantity of “nonhidden” work which was later embodied in some 142 field directives delayed it 70 days in the completion of the subcontract over and above the 50 days delay which plaintiff assigns to other specific causes as related in findings 9 through 19. The 70 days of alleged delay is obviously a forced figure arbitrarily chosen which, when added to the 50 days of delay attributed to specific causes, accounts for the deferred completion of the subcontract on July 8, 1953, instead of on the original subcontract completion date of March 6,1953,120 days earlier. Thus the plaintiff attributes all of its delays to the defendant and its agents, and assumes that it was responsible for none of the delays.
(d) In support of its contentions relative to the 70 days of delay attributed to the failure of the original specifications to cover all of the “nonhidden” work for which 142 field directives were subsequently issued, the plaintiff prepared an *86 analysis of tbe approximately 693 field directives issued during the course of subcontract performance, of which total 551 (more or less) related to so-called “hidden” work. As to the 551 field directives covering “hidden” work the plaintiff concedes that in rehabilitation work of the type in suit the discovery of unanticipated items of work as the job progressed is inevitable, expected, and normal, although the quantity and scope of the “hidden” work involved in this subcontract was abnormal. It is understood that plaintiff does not base its 70 days delay claim on any delays incident to the issuance of field directives covering the “hidden” work, even though it does vigorously maintain that in many of these instances the field directives were issued late and frequently only after heated disputes with a Mr. Farrara, the man assigned by the Architect-Engineer as its on-site inspector of the subcontract in suit. The plaintiff’s theory is that if the original specifications had included the “nonhidden” work items subsequently included in 142 field directives, it could have prepared an orderly schedule for labor and materials so that the work could have been done simultaneously with the performance of all other work actually called for in the specifications, instead of which the orderly schedule contemplated was constantly being disrupted.
(e) The plaintiff’s analysis of the 142 field directives covering “nonhidden” work items shows as to each the date of issuance, a brief description of the work involved, its cost, and in most cases the starting and finishing dates of the extra work. These 142 directives were issued at various times from December 10, 1952 to June 25, 1953, as compared with the subcontract starting date of October 27,1952 and actual completion date of July 3,1953. The plaintiff also prepared an elaborate chart which purports to depict as to each of some 65 selected field directives the effect that late issuance had on orderly progress of the work. A close study of the chart, however, discloses major inconsistencies. Thus 38 of the 65 items depicted on the chart as being field directives relating to “nonhidden” work do not appear classified as such in plaintiff’s analysis of the 142 field directives covering “non-hidden” work and thus must relate to field directives covering *87 “bidden” work, which is not urged by plaintiff as a basis for its claim of 70 days delay. Discovery of such a major discrepancy casts serious doubt on the accuracy of plaintiff’s presentation. This documentary presentation was accompanied by the testimony of plaintiff’s officers and engineer personnel on the job. Their testimony provided strong support for the general conclusions that (1) the work covering the 142 field directives for “nonhidden” work items (if there were actually that many) should have been included in the original specifications, (2) had this been done the plaintiff could have planned its work in a more orderly fashion and placed timely orders for materials so that they would have been available when needed, and (3) Mr. Farrara, the inspection representative for the Architect-Engineer, complicated matters by creating unnecessary friction with plaintiff’s personnel and by his arbitrary attitude in refusing to issue field directives. Testimony of plaintiff’s personnel was specific as to only 17 of the 142 field directives covering allegedly “nonhidden” work, and as to those instances it gave reasonable assurance to the conclusion that the work should have been included in the original specifications. It would have been unduly burdensome to the record to have had testimony on each of the 142 field directives in question, but the serious discrepancy found earlier in this paragraph with respect to the chart evidence does not justify uncritical reliance on the testimony concerning 17 instances as being a reliable sampling of the 142 field directives.
(f) Moreover, if as plaintiff avers the 65 field directives depicted on the chart are supposed to consist of “haul and install” items described in finding 18, supra, and are at the same time alleged to represent “nonhidden” work, a serious question exists as to whether the plaintiff is correct in saying they should have been included in the original specifications. Finding 18 describes how the plaintiff was to use parts stored since World War II in warehouses on the site of the Volunteer Ordnance Works, and how the Atlas Powder Company had stopped plaintiff in early 1953 from using any more of the parts because Atlas wanted to keep them intact for future maintenance purposes. This being the case the 65 *88 field directives depicted on tbe chart were issued to overcome the situation caused by Atlas and not to cure the omission of the original specifications. As stated in finding 18, although the plaintiff contends that it was delayed because of this action on the part of Atlas in connection with “haul and install” items, it specifically makes no delay claim on that basis because the delays are conceded to have overlapped other delays for which claims are made.[4] Thus, by necessary inference, the plaintiff has not measured and does not rely on those delays which may actually have resulted from the issuance of 65 of the 142 field directives said to have been issued to cover “nonhidden” items.
Finally, there is additional reason to question whether 27 of the 142 field directives referred to actually involved “non-hidden” work as the plaintiff contends. These 27 field directives are included in 6 subcontract modification agreements accepted by the plaintiff. Attached to each of the 6 modification agreements is a Finding of Fact made by the prime contractor covering the additional work in the related modification agreement. Each of the Findings of Fact states in part as follows: “The need for this work and material was determined in the field after tests and/or dismantling of equipment involved.” While the Findings of Fact containing the quoted language were unilaterally issued by the prime contractor, and were not approved directly by the plaintiff, nor were they incorporated by reference in the modification agreements to which they relate, there is no record that the plaintiff took any exception to these findings. However, it is considered likely that the plaintiff was aware of the findings at the time it accepted the modification agreements without protest, and without some other explanation it is deemed that 27 of the 142 field directives involving $95,339 were thereby admitted by the plaintiff to involve work and material the need for which “was determined in the field after tests and/or dismantling of equipment involved.”
(g) Plaintiff’s personnel made repeated complaints about the conduct of Mr. Farrara and his refusal to cooperate in *89 the issuance of field directives. Because of the complaints the Architect-Engineer removed Mr. Farrara from his duties as inspector and assigned him to office duties. The Architect-Engineer appointed in Mr. Farrara’s place a Mr. Futrell, who had theretofore worked as Mr. Farrara’s assistant. Called as plaintiff’s witness Mr. Futrell corroborated the testimony of plaintiff’s personnel that Mr. Farrara had been unpleasant in his dealings and dilatory in the issuance of field directives. After Mr. Futrell took over Mr. Farrara’s duties the plaintiff had no further difficulties in obtaining field directives. The statistical record of the 142 field directives covering allegedly “nonhidden” work inferentially bears out this fact, since 31 of them were issued during Mr. Farrara’s incumbency of the job and the remaining 111 were issued during the four months that Mr. Futrell had the job. However, it is undoubtedly true as defendant’s witnesses testified that frequently the plaintiff’s disputes with Mr. Farrara were solely as to whether the extra work for which a field directive was requested was actually covered by the basic specifications, and of course neither side was always right. Mr. Farrara was not called as a witness.
(h) Two other facts are significant in support of the plaintiff’s contentions concerning the delay in issuing field directives. One is the unexplained fact that the defendant did not call as witnesses any representatives from the prime contractor, with which plaintiff had its principal dealings during subcontract performance. The other is that Mr. Leonard, who was in overall charge of the Architect-Engineer’s contract responsibilities at the Volunteer Ordnance Works, testified as defendant’s witness that he had no personal knowledge or clear recollection of the details concerning delays in the issuance of field directives and recalled only that he had received no complaints from the plaintiff at the time relating to such delays. This is rather difficult to reconcile with Mr. Leopold’s removal of Mr. Farrara after plaintiff’s numerous complaints relative to delay in issuing field directives. The defendant’s resident engineer also testified that he never heard complaints by plaintiff about delay *90 in issuing orders for “bidden” work, but be was rather removed from such details and bis knowledge was largely hearsay. Quantitatively and qualitatively the plaintiff’s evidence that it bad been delayed by the late issuance of field directives covering work which should have been included in the original specifications preponderated over a virtual absence of evidence on this point from the defendant.
(i) A voluminous “administrative record” consisting of extensive correspondence, schedules, etc., demonstrates surprisingly little contemporaneous reference to complaints by plaintiff of delay in issuance of field directives. It would appear that most of such complaints were made verbally.[5] The administrative record, together with other documents in the “de novo” record compiled in the trial before this court, reflect a great deal of disagreement at the time as to (1) whether certain work in field directives was or was not covered in the basic specifications, and (2) the amount of equitable adjustment to which plaintiff was entitled for work done under the field directives.
(j) Although it is found that plaintiff was delayed by the late issuance of field directives covering “nonhidden” work which should have been included in the original specifications, the plaintiff has not satisfactorily proved that it was delayed 70 days as claimed for this cause alone. The problem is one of apportionment and there is little to go on. The plaintiff was granted time extensions totaling 135 days for all of the work done pursuant to field directives of all kinds, plus an additional 30 days for work done under a supplemental agreement, bringing the revised contract completion date to August 18,1953, although it was actually completed on July 3, 1953, 46 days sooner. The fact that time extensions were granted would be an admission on the defendant’s part that the work done under the field directives delayed the plaintiff 135 days and would provide a rebuttable presumption that the plaintiff was not partially responsible for the delay in completing the subcontract, but it would not constitute an *91 admission by the defendant of the plaintiff’s contention that delay in the issuance of 142 field directives covering “non-hidden” work caused it to complete the subcontract 70 days later than it otherwise would have. There is in fact no method by which it can be accurately determined what part of the 70 days delay claimed by plaintiff can be apportioned to delay in the issuance of the 142 field directives under consideration. Under the circumstances it is reasonable to conclude on the basis of a “jury verdict” type of estimate that 20 of the 70 days of delay can be reasonably attributed to delay in the issuance of the field directives relating to actually “nonhidden” work, and the balance to causes for which the plaintiff has not made specific claim. This estimate takes into consideration such matters as the relative weights from a numerical as well as a cost standpoint between field directives involving “hidden” and “nonhidden” work, the discrepancies in the plaintiff’s presentation to which reference has been made in paragraphs (e) and (f) of tins finding, and the defendant’s evidence that the plaintiff’s job performance suffered from lack of adequate supervision in its early stages.
Delays by PlaiNtiee
23. General. In estimating the delays occasioned plaintiff by reason of late issuance of field directives covering “non-hidden” work, the plaintiff’s claim of 70 days has been substantially discounted for several reasons, among them delays for which plaintiff was responsible (finding 22, supra). Findings 24 and 25 will summarize the evidence with respect to the latter.
24. Lade of early supervision and worlc force.
(a) In the first two months of subcontract performance the plaintiff’s top supervisory personnel were occupied much of the time in preparing plaintiff’s bids for other subcontracts to be let at the Volunteer Ordnance Works. To the extent they were so engaged the subcontract in suit suffered from a lack of adequate supervision. During this same period the plaintiff did not mobilize an adequate labor force, although there was a locally available supply. At the same time, however, the plaintiff’s progress was being substantially *92 interfered with by reason of some of the delays described in findings 9 through 19, supra. Had plaintiff mobilized more promptly and with a more adequate labor force and supervision, it could not have utilized its forces at maximum efficiency. A precise balance cannot be struck between the respective failures of the parties during the period mentioned. The delay is nonapportionable.
A detailed study of the daily construction logs maintained by the defendant’s resident engineer, and daily progress reports maintained by the prime contractor, reflect that from the commencement of the subcontract to the end of 1952 the plaintiff increased its workforce from 99 men to 224 men, but an unknown number of these men were working on the plaintiff’s other subcontract on the powerhouse at Volunteer Ordnance Works. The resident engineer’s daily construction logs contain no entries during this period to the effect that plaintiff was slow in starting up, even though the logform contains a space for “Bemarks (Plant, Material, Visitors, Delaying Factors, etc.)”. Nor do the daily progress reports maintained by the prime contractor reflect any complaints about plaintiff’s progress through February 1953. It is fair to say, however, that both sets of daily reports contain only the most meager description of the daily construction activities of each subcontractor.
(b) On November 19, 1952, the prime contractor advised the defendant’s resident engineer that “the diligence, excellence of performance and fine- progress they [the plaintiff] have demonstrated to date in the execution of their undertakings on this project” justified granting of plaintiff’s request for semimonthly progress payments rather than monthly payments. This early praise was curiously inconsistent with subsequent letters by the prime contractor complaining of lack of progress, as will appear.
25. Progress complaints and worh acceleration.
(a) On December 22, 1952, the prime contractor wrote to plaintiff confirming a recent progress conference and expressing concern over the fact that the plaintiff was behind schedule, particularly with reference to the work of its electrical subcontractor which was said to be undermanned, *93 poorly supervised, uncoordinated, and less than 10 percent complete. The prime contractor demanded that plaintiff take immediate steps to improve its progress so as to meet the March 6, 1953 completion date. The plaintiff eventually had to replace its original electrical subcontractor.
(b) On January 2, 1953, the prime contractor again advised plaintiff that it was behind schedule particularly in certain areas of its work such as the oleum, sellite and electrical installations. The prime contractor insisted that plaintiff provide sufficient labor, properly supervised and coordinated, to have the North Acid Area ready to operate by March 1,1953.
(c) On January 12, 1953, the prime contractor wrote to plaintiff reviewing the serious lag in the progress of the Mantius units, which it predicted would not be ready for operation until the last half of April unless plaintiff accelerated its working schedule to meet the March 7 deadline. The plaintiff promptly promised to try to meet the original schedule, but pointed out that the prime contractor had itself held up the work on the Mantius units. Findings 12 through 14, supra, describe the delays to the Mantius units for which the plaintiff was not responsible. On January 13, 1953, the prime contractor advised plaintiff that, although the mechanical work in the Mantius units was somewhat ahead of schedule, the brick subcontract was very much behind schedule, and the plaintiff was warned that any request for a time extension beyond the March 6, 1953 deadline would be refused. This warning confirmed earlier advice by the prime contractor to plaintiff that no time extensions would be granted regardless of the cause of delays. On January 26, by which time plaintiff had put its bricklayers on a seven-day, ten-hour schedule, the plaintiff protested to the prime contractor that it was not responsible for the delays and predicted that the job would run past the required completion date despite the overtime labor. The plaintiff had already indicated to the prime contractor by letter of January 22 that a time extension would be needed because of the disruption of its schedule by a quantity of additional work imposed by field directives.
*94 (d) On January 28, 1953, the prime contractor directed plaintiff in writing that, because it bad completed only 45 percent instead of a scheduled 71 percent of the subcontract, it must either put 50 of its men to work in the ammonia oxide building on a nine-hour,, six-day basis or accomplish the same results by a double shift, and in addition, put the electrical subcontractor on the same schedule and continue the 70-hour per week basis for the brick and lead-burning subcontractors. The prime contractor was concerned only in accelerating the work to meet the completion date, but actually left it up to the plaintiff to decide the means of acceleration, either by overtime or larger work force. Section 1-10 (b) of the subcontract empowered the prime contractor to require plaintiff to increase shifts, etc., to keep on schedule, without cost to the prime contractor. Apparently the plaintiff complied with the equivalent of these directions, but it is somewhat difficult to determine precisely what parts of the job were put on intensive overtime or augmented forces and what parts were not. The general effect of the prime contractor’s repeated remonstrances was to apply overtime or its equivalent to those parts of the job which were behind schedule, regardless of the fault for the delay, in order to meet the target date. The plaintiff asked that it be relieved of overtime in certain areas of the work where it felt that intervening conditions prevented efficient use of overtime or extra help, but the prime contractor refused the plaintiff’s request to discontinue costly overtime.
(e) The plaintiff felt that even with the intensive overtime it'Would be unable to meet the completion date, and on February 3,1953, requested a 30-day extension of time, citing as reasons the delays on the Mantius units attributed to the defendant. On February 10 the defendant promised to grant a 15-day time extension on the basis of additional work covered by field directives, but not on the basis requested by plaintiff relative to delay on the Mantius units. By reply of February 17 the plaintiff vigorously defended its request to the prime contractor and renewed its request for a 30-day time extension, rebutting the defendant’s reason for the *95 earlier rejection. Pressures were mounting during this period and apparently recriminations were flying back and forth, for on February 18, 1953, the prime contractor, after urging “your fine company” [the plaintiff] to join in getting on with the job instead of wasting time bickering, ended on a cordial note by saying “You are doing a fine job — bear down a little harder.”
(f) On March 4, 1953, the plaintiff requested permission from the prime contractor to discontinue its seven day per week schedule on buildings Nos. 304-1 and 308-1 because the work in these buildings would have to be suspended until certain essential units were reconditioned and reinstalled. The prime contractor refused to grant the request because it believed that the schedule on the buildings could be maintained even though the defective units referred to would not be available for reinstallation until March 20. The merits of these respective contentions cannot be resolved on the present record.
(g) On March 14,1953, the prime contractor issued Modification No. 2 to the subcontract which authorized additional compensation to plaintiff for the performance of extra work under field directives previously issued, and granted plaintiff a time extension of 15 days (to March 21) for that reason. By letter of March 19,1953, to the prime contractor, the plaintiff requested a time extension to April 15, 1953, due to the quantity of extra work ordered outside the original contract. On March 24,1953, the prime contractor took the request for a time extension under advisement, and pointed out that certain designated parts of the subcontract had to be completed by March 31,1953.
Finding 31(c), infra, recites the contents of a Conferees Report of May 1955 which was a key document in the administrative processing of plaintiff’s claim. It has the effect in relevant part of a recognition by all parties concerned that plaintiff used a 40-hour week from the start of its subcontract through January 1953, and a 48-hour week or more thereafter. During this latter speedup period the Daily Logs of Construction maintained by defendant’s resident engineer *96 disclose that the plaintiff, unlike the prime contractor and the many other subcontractors engaged in performing aspects of the prime contract, maintained large crews of men on the job on most Saturdays and smaller crews on some Sundays in an effort to accelerate completion.
(h) In recapitulation, it is fair to conclude that, although the prime contractor had some partially justifiable grounds of complaint about the plaintiff’s slow progress in the early months of performance, its continued insistence through February 1953 that the plaintiff meet the original completion date regardless of causes for delay was unreasonable and was dictated largely by its own commitment to the defendant to complete the entire “crash” program at the Volunteer Ordnance Works on time. Its rejection of plaintiff’s requests for time extensions caused plaintiff to make unnecessary expenditures in overtime in order to meet a completion date which intervening circumstances had made unrealistic, as demonstrated by subsequent time extensions which were granted after it was too late to avoid the previous investments in overtime. The eventual completion of the subcontract on July 3, 1953, 46 days earlier than the revised completion date of August 18, 1953, set by subsequent time extensions, strongly supports the conclusion that the plaintiff was coerced into excessive overtime only because the prime contractor unduly delayed issuing time extensions until it was too late to benefit the plaintiff. Had the plaintiff been able to anticipate the time extensions which were eventually granted, and had it used the unused period of time extension, the overtime and extra forces which it employed to accelerate completion of the original subcontract work would have been sharply reduced if not eliminated.
ADMINISTRATIVE REMEDIES
26. Summary of subcontract modifications. The following table lists four supplemental agreements and 11 change orders which were issued as subcontract modifications, together with other self-explanatory data:
*97 Adden-Modification No. Date dum Amount S.A. No. 1_ 0.0. No. 2. S.A. No. 3. 0.0. No. 4. 0.0. No. 6. 0.0. No. 6. S.A, No. 7_ C.O.No. 8. 0.0. No. 9. 0.0. No. 10. 0.0. No. 11. 0.0. No. 12. 0.0. No. 13. 0.0. No. 14. S.A. No. 15. 30 Dec. 1952 14 Mar. 1953 20 Feb. 1953 4 May 1953 19 May 1953 9 June 1953 18 June 1953 19 June 1953 2 July 1953 10 July 1953 25 Sep. 1953 15 Oct. 1953 2 Feb. 1954 12 Apr. 1956 13 Apr. 1956 1 2 3 4 5 6 7 8 10 11 12 12 13 12&13 $10,131.43 17,776.62 14,037.53 17,451.65 26,141.61 126,594.36 62,049.98 33,473.38 32,079.51 48,817.37 148,448.84 293,475.87 78,944.54 12,118.31 116,057.28 Total..... Subcontract-Basic... $1,037, 598.27 $1,234,657.89 Total. $2,272,156.17 Time Ext. 15 30 30 46 30 15 165 Payments Accepted by Subcontr. $10,131.43 17,776.62 14,037.63 17,451.65 26,141.61 126, 594.35 62,049.98 33,473.38 32,079.61 48,817.37 148,448.84 293,476.87 78,944.64 12,118.31 116,057.28 Yes Yes Yes Yes Yes Yes Yes Yes Yes Yes Yes No No No Yes Yes $1,037,598.27 $1,234,557.89 $2,272,156.17
Those subcontract modifications denominated change orders covered work performed under field directives which was related to the scope of work in the original specifications, while the supplemental agreements covered work which was not so related.
27. Unresolved disputes over equitable adjustments. Although it was intended that all field directives issued each month would be incorporated promptly in monthly modification agreements which would reimburse the subcontractor, this procedure broke down in practice due to the inability of the parties to agree on the proper amount of equitable adjustment for particular field directives. The plantiff was slow in submitting many of its cost proposals, and frequently when submitted they were returned for recomputation in order to correct errors or to reduce the amounts claimed as reasonable compensation. It was difficult to segregate the costs for field directive work from costs for other contract work, particularly as to labor costs. By September 25,1953, when the parties entered into the eleventh modification agreement (approved by plaintiff in each case), there remained a residue of 328 disputed cost proposals covering work under field directives.
*98 28. Modification No. 12. The parties conferred at great length in an effort to reach an agreement on the amounts to be paid for the field directives represented by the plaintiff’s 828 cost proposals in dispute. They reached agreement on some but not on all items. The plaintiff requested the issuance of Modification No. 12 in whatever amount could then be approved in order to meet its pressing subcontract obligations, for much , of the work which had not been paid for had been ordered and performed during the early months of the subcontract. Modification No. 12 was duly issued on October 15, 1953 and, although plaintiff refused to approve the agreement, it was paid and accepted $293,475.87 under protest, instead of the $657,140.48 which it then claimed to be due. Subsequently, after further conferences, the payment under Modification No. 12 was increased by $78,944.54 to $372,420.41 by Modification No. 13.
29. Modification No. IS. After a further exchange of correspondence in an unsuccessful effort to reach agreement on the items remaining in dispute, on February 2, 1954, Modification No. 13 was duly issued providing payment to plaintiff of $12,118.31 for work which had not been included in previous modifications and for which plaintiff had claimed the sum of $27,325.90. As stated in finding 28, this modification also increased the payment under Modification No. 12 by $78,944.54. The plaintiff refused to sign its acceptance of the modification.
30. First decision of contracting officer.
(a) The subcontract contained a standard disputes clause empowering the contracting officer to decide disputed questions of fact, with appeal to the Chief of Engineers, whose decision was final. By virtue of the disputes clause in the prime contract the plaintiff apparently could appeal from the decision of the Chief of Engineers to the head of the department through the Armed Services Board of Contract Appeals.
(b) The subcontract also contained a changes clause authorizing the prime contractor, with the contracting officer’s approval, to issue change orders and pay equitable adjustments therefor, with disputes thereunder to be decided pursuant to the disputes clause.
*99 (c) As of February 5, 1954, tlie plaintiff had refused to accept Modification No. 13 which proffered it $12,118.31 instead of the $27,325.90 claimed by plaintiff for the work covered by the modification. On that date, when the plaintiff had an overall net claim of $277,560.90 ($662,099.62 less $384,538.72 paid or tendered), the prime contractor submitted the dispute to the contracting officer for decision under the disputes clause of the subcontract. Pending his decision the contracting officer released to plaintiff the balance of the unpaid sums proffered by Modifications 12 and 13. The plaintiff declined the contracting officer’s invitation to submit further data to help him decide the dispute, purportedly because plaintiff had not been informed precisely which invoices, etc., supporting its claim were being challenged. On March 12,1954, the contracting officer made his decision that the sums provided plaintiff by Modifications 12 and 13 constituted adequate equitable adjustments under the subcontract. Other than the conclusion stated, the decision of the contracting officer contained no findings of fact as required by Corps of Engineers procedures. Plaintiff was advised of its right to appeal to the Chief of Engineers.
(d) On March 19, 1954, plaintiff signed a release form and a payment estimate. The release form contained an exception as to the “unpaid portion of amounts shown on proposals for extra work submitted to Hiwassee Constructors, and as per letter attached.” The letter attached advised Hiwassee that “Our claims for additional reimbursement are being appealed to the Chief Engineer, Washington, D.C., and we 'are not releasing Hiwassee Constructors from their responsibility in making payment for these unpaid balances.” The payment estimate was “executed under protest as per attached letter.” The attached letter advised Hiwassee that plaintiff was executing the payment estimate “with the understanding that we are not in agreement and that the totals involved do not represent a complete settlement equitable to the Brock and Blevins Company. This is your notification that we are preparing an appeal for decision and collection of the balance involved.”
*100 31. Appeal to the Ohief of Enginers.
(a) After a duly filed notice of appeal the plaintiff on May 3,1954, filed its appeal to the Engineers Claims and Appeals Board, seeking payment of $265,688.03 as additional equitable adjustment for changes under the subcontract. In that part of its appeal relating to its claim of $26,999.16 for Equipment and Tools, the plaintiff contended that it had been paid only $10,075.92 for equipment costs .of $37,075.08, not including standby time which was “being assumed by Brock & Blevins”.
(b) In November 1954 counsel for plaintiff and for the Division Engineer, South Atlantic Division, Corps of Engineers, agreed by correspondence on a pretrial method involving conferences between representatives of all parties concerned for the purpose of reviewing in detail the equitable prices to be paid for 'all items of work in dispute. In consenting to the suggested method plaintiff’s counsel stated that the “fundamental issue in the case of any or all field directives is what amount of compensation constitutes a fair, reasonable and equitable price for a satisfactory performance of the work under all of the circumstances and conditions which existed on the job site at the time the work was done.” The Division Engineer could not settle the claim but could only make recommendations to the contracting officer and, failing the latter’s approval, submit the recommendations to the Engineers Claims and Appeals Board.
(c) Representatives of the plaintiff and the Division Engineer conferred for 30 days between December 13,1954 and February 28, 1955, and reviewed the plaintiff’s claim in exhaustive detail. In May 1955 the Division Engineer put out a detailed Conferees Report on Review of Claim which concluded with the finding that the plaintiff was entitled to be paid $114,673.28 (after eliminating a “legal dispute” item of $33,421.75 which plaintiff alleged in its petition but subsequently abandoned) more than it had been paid for Modifications 12 and 13, instead of the adjusted figure of $266,312.10 claimed by the plaintiff. The following conclusions were among those agreed to by the conferees:
(1) A forty-hour work week was used from the start of construction through January 1953.
*101 (2) A forty-eight hour work week or more was used from February 1953 through to completion.
(3) There was approximately a 300 percent turnover in labor.
(4) There was no delay in construction due to late delivery of materials or equipment.
(5) The agreement on the amount of direct labor involved in the disputed items was increased by one-third to provide for lost time, on the basis of two hours lost time for each 8-hour work day.
(6) An amount of 16% percent was included in the estimates for overtime premium payment, based on an average week of 48 hours with premium payment for 8 hours.
(Y) Allowances for overhead included, among other matters, costs of supervision, tools, equipment[6] and supplies, and equipment operators.
Although the Conferees Report was not signed by the plaintiff, the circumstances surrounding its preparation and the subsequent acceptance by plaintiff of its recommended benefits constitute a constructive stipulation of the report contents.
(d) The Conferees Report was sent to the contracting officer by the Division Engineer. On August 25, 1955, the contracting officer, after a consideration of the report, decided that he was not justified in changing his previous decision in respects relevant to the present issues, and recommended that the Conferees Report should be sent to the Engineers Claims and Appeals Board to assist it in arriving at a decision on the still pending appeal. In a separate letter of the same date to the Division Engineer the contracting officer advised, however, that he would have no objection to the Board rendering a decision in the amount of $500,596 for the work covered by Modifications 12 and 13, which was $116,05Y.28 more than the modifications then provided.
(e) On August 30,1955, the plaintiff agreed to submit the dispute to the Board on the record, including the Conferees Report, with the understanding that if the Board should find a sum less than the conferees had recommended, the plaintiff *102 would wish to preserve its rights to contest the matter before the Board. The matter was submitted to the Board on this basis, and on December 23,1955, the Board found the sum of $500,596 to be due plaintiff as equitable adjustments for work covered by Modifications 12 and 13, less the sums already paid, or a net due plaintiff of $116,057.28. The decision was approved by the Chief of Engineers (disputes clause provided for appeal from the contracting officer’s decision to the Chief of Engineers without the right of delegation). There was no motion for reconsideration nor an appeal to the Armed Services Board of Contract Appeals.
(f) The disputes clause in Hiwassee’s prime contract provided for an appeal to the head of the department from the decision of the Chief of Engineers, whose decision was final on questions of fact in the absence of such appeal. The disputes claim in plaintiff’s subcontract made the decision of the Chief of Engineers final without specifying a right of appeal beyond him to the head of the department. But by Article II of the subcontract the plaintiff bound “himself to the contractor and to the Government to comply fully with all the undertakings and obligations of the contractor, excepting such as do not apply to the subcontractor’s work, as are set forth in the principal contract * * * which is hereby adopted and made a part of the subcontract.”
32. Modification No. lip. The additional compensation found due plaintiff by the Board in the amount of $116,057.28 was paid to plaintiff by Modification No. 14 issued April 12, 1956, thus increasing the equitable adjustments under Modifications 12 and 13 to a total of $500,596. The plaintiff signed its acceptance of Modification No. 14, and made no reservations, exceptions, or other claims at that time. On April 21, 1956, the plaintiff executed a final payment estimate dated April 18, 1956, in the net amount of $116,057.78, under the certification that “The above bill is correct and just * *
33. Modification No. 15. By supplemental agreement of April 13, 1956, known as Modification No. 15, the subcontract in suit was assigned to the Government together with fill obligations and responsibilities of the prime contractor,
*103 34. Effect of administrative settlement on delay claim.
(a) At no time during the extensive negotiations between the parties which led to the administrative settlement of plaintiff’s claims left unresolved from Modifications 12 and 13, as related in the preceding findings 26 through 33, did the plaintiff make any claim for unliquidated damages for delays as such. All of the negotiations related to the amount of equitable adjustment due plaintiff as reasonable compensation for the plaintiff’s direct and indirect costs incurred in the performance of 328 field directives on which plaintiff had outstanding payment proposals. It is reasonable to conclude that the plaintiff during that period did not conceive of a delay claim as such, and that the possibility did not occur to plaintiff until after it had effected its administrative settlement.[7] in the form of Modification No. 14 (finding 32, supra). Undoubtedly it was the intention of the parties at the time that they had effected a settlement of all claims arising out of subcontract performance, even though the amount ultimately paid was $150,254.82 less than the plaintiff had claimed.[8] During the conferences forming the basis of the decision of the Chief of Engineers there was no discussion as to the authority of the Chief of Engineers to compromise a claim for unliquidated damages. The legal representatives of the Division Engineer who negotiated the agreement at the conferences did not recommend that plaintiff be required to sign a general release, and none was prepared or signed by plaintiff. The question of a release never arose. The plaintiff did not indicate at the time it accepted Modification No. 14 that it had any further claims. Hiwassee’s prime contract required the prime contractor, as a condition prerequisite to final payment, to execute a general release, with the right to express exceptions. *104 Plaintiff’s subcontract contained no such clause, unless it would be incorporated by reference (see paragraph (f) of finding 31, supra).
(b) The defendant contends that acceptance by the plaintiff of the final settlement embodied in Modification No. 14 constituted an accord and satisfaction of all claims of any kind, including delay claims, because it was based on the Conferees Report which made liberal allowances in estimating overtime, equipment, overhead and profit. The nature of these allowances is described in finding 31 (c), supra. The plaintiff contends that it made no administrative claim for unliquidated damages for delay because there was no subcontract authority to pay such claims administratively, and that the amounts it claims for delay were not included in the payment for extra work under Modification No. 14.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and its petition is therefore dismissed.

 We might comment, however, that we believe there was sufficient privity in this case to allow the subcontractor plaintiff to bring suit against the Government. . There was an assignment oí the subcontract by the prime contractor to the Government, together with all obligations and responsibilities of the prime contractor. The acceptance of this assignment by defendant is sufficient to establish the privity necessary for plaintiff’s suit.

 The Division Engineer could not settle the claim, but could only make recommendations to the contracting officer, and failing the latter’s approval, submit the recommendations to the Engineers Claims and Appeals Board.

 In substance this was a settlement, although in form it was a modification agreement entered into pursuant to findings of the Engineers Claims and Appeals Board and decision of the Chief of Engineers in connection with plaintiff’s appeal from the contracting officer. The opinion of the Board was in reality a ratification of the parties’ agreements rather than an adjudication, except as to one small issue which is not presently involved.

 Despite tie fact that the subcontract was denominated a “lump sum construction contract”, the plaintiff asserts that by nature it was not a lump sum contract. There is merit to this contention. The combination of a cost-plus prime contract and a lump sum subcontract is unusual, to say the least.

 Plaintiff’s claim of 50 days has been reduced to 40 days in relevant findings, and its claim of 70 days has been reduced to 20 days.

 Although the Architect-Engineer testified that a month’s notice was required, apparently the prime contractor felt that a shorter notice would be adequate.

 In its requested finding 75 the plaintiff is claiming delay in connection with “haul and install” items, even though requested finding 46 seems to consider these delays overlapped others and cannot be measured.

 The only contemporaneous written complaint in the record is plaintiff’s letter of February 3, 1953, to tbe prime contractor, wbicb refers to its continuing difficulty in getting field directives issued, a matter wbicb plaintiff asserted had been “repeatedly brought to your attention”.

 Note that In Its appeal to the Chief of Engineers (paragraph (a) of this finding) the plaintiff said that as to the item of Equipment and Tools it was charging the defendant only for the time the equipment tyas used, and that the plaintiff itself was assuming all standby time,

 In substance this was a settlement, although in form it was a Modification Agreement entered into pursuant to findings of the Engineers Claims and Appeals Board and decision of the Chief of Engineers in connection with plaintiff's appeal from the contracting officer. The opinion of the Board was in reality a ratification of the parties’ agreements rather than an adjudication, except as to one small issue which is not presently involved.

 The precise amount claimed by plaintiff administratively fluctuated slightly, but its adjusted claim considered by the conferees (finding 31(c)) was $266,312.10.