Per Curiam :
This case was referred to Trial Commissioner William E. Day with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on August 8,1968. Plaintiffs have filed exceptions to the commissioner’s opinion, findings of fact and recommended conclusion of law and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the *801 opinion, findings and recommended conclusion of law of tbe commissioner, with, a slight modification, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth. Therefore, neither plaintiff is entitled to recover and the petitions in both cases are dismissed. Defendant is entitled to recover from the plaintiff, Winder Aircraft Corporation of Florida in case No. 317-62 on defendant’s counterclaim in the amount of $3,525.82 and judgment is entered for defendant accordingly.
OPINION OP COMMISSIONER
Day, Commissioner: These two cases (No. 317-62, a suit on a Navy contract and No. 318-62, a suit on an Army contract) were tried in one proceeding. While not formally consolidated for trial, as a practical matter they will be regarded as having been so consolidated, since they were tried together.
At pretrial proceedings (before the late trial commissioner Robert K. McConnaughey) the defendant urged its objection to the receipt of de novo evidence, relying on the case of United States v. Carlo Bianchi & Co., 373 U.S. 709 (1963). Commissioner McConnaughey, in effect, overruled the defendant’s objection and scheduled the case for trial shortly before he died. The cases were scheduled for trial in Florida and in Washington, D.C., when they were reassigned to the writer of this opinion and report. Trial sessions were conducted for two days at Tampa, Florida, one day at Jacksonville, Florida and two days at Washington, D.C.
There is no question that Winder Aircraft Corporation of Florida sustained large losses on both contracts. During performance, Winder assigned the contract proceeds to The Seminole Bank of Tampa, Tampa, Florida. That bank was paid the full contract price on the Army contract and the full price to which Winder was entitled to the extent it performed the Navy contract. There is a counterclaim filed by the defendant as to case No. 317-62. For reasons which follow, and on the basis of the findings of fact, including ultimate findings, it is recommended that the plaintiffs’ petitions be dismissed and that ¡the defendant have judgment on its counterclaim in case No. 317-62.
*802 CASE NO. 317-62
By the plaintiffs’ petition in No. 317-62 (involving the Navy contract) Winder claims damages of upwards of $50,-000, which it attributes to work stoppages by the defendant’s inspector, inadequacies in the drawings (which necessitated extra work) and also a claim that Winder had made a mistake in its bid which was so great as to put the Navy on notice of such mistake, and which resulted in the unjust enrichment of the defendant.
As the findings of fact show, the plaintiffs did not quarrel with any contracting officer’s decision and therefore filed no appeal from such decision under the Disputes clause of the contract. Plaintiffs having therefore failed to exhaust the administrative remedies as to the claim involving inadequacies in the drawings, that claim will not be further considered by this court. Justice White said in United States v. Utah Constr. & Mining Co.:
* * * With respect to relief available under the contract, therefore,, the contractor must exhaust his administrative remedies and the findings and determination of the Board would be subject to review under the Wunder-lich Act standards, * * *. 384 U.S. 394, 402. (1966)
Winder did file a claim under Public Law 85-804, approved August 28, 1958 (72 Stat. 972)[1] and that claim was denied by the Chief Signal Officer on September 2,1959. The petition does not attack such denial, but even if it did, this would not help the plaintiff since the action by the responsible government official on such a claim is entirely discretionary, since an allowance of such a claim required a finding by the official considering it that “such action would facilitate the national defense” under the Act referred to above. See Bolinders Company, Inc. v. United States, 139 Ct. Cl. 677, 153 F. Supp. 381 (1957), cert. denied, 355 U.S. 953 (1958).
Winder thereafter filed a claim with the Comptroller General which was also denied.
As to the claims in the petition that Winder was damaged by work stoppages imposed by Navy inspectors, the findings *803 show that the plaintiff was not stopped or hindered in its production except that its responsible officers were advised that the Navy would not accept production items which did not conform to the contract specifications. Although such warnings caused Winder to stop work at times, seeking waivers of the specification requirements, they can by no stretch of the imagination be regarded as impairments of Winder’s performance by the defendant.
The findings further show that the inspection procedures of the Navy did not unreasonably delay Winder’s performance of the contract work. The plaintiffs, therefore, cannot recover on this item of claim.
With regard to the plaintiff’s claim as to a mistake (amounting to a mutual mistake) in its bid, it is clear that when the bid was received, the defendant’s procurement officers both telephoned and telegraphed Winder to double check its figures. This action was taken because the bid was considerably lower than other bids. Winder’s vice president, both orally and in writing, confirmed that Winder had checked its bid again and confirmed that it would stand behind the bid as submitted and deliver the contract items at the bid price. Even if Winder did make a mistake, this evidence would very clearly place such mistake in the category of a unilateral mistake at best. As the findings show, however, the proof as to any mistake is not convincing. Winder produced no original work papers. The only testimony about the mistake was from Winder’s president, who testified generally that the mistake was due to the misplacing of a decimal point as it applied to the hours of labor. This claim falls with a failure of proof.
Since The Seminole Bank of Tampa has been paid (as assignee of the contract proceeds) all sums to which Winder would have been entitled absent the assignment, the United States is not liable to pay any additional sums to that bank.
DEFENDANT’S COUNTERCLAIM IN CASE NO. 317-62
The defendant returned 25 defective quadpak cradles to Winder’s plant to be reworked by the plaintiff. It was shown that of that number, 2 units were not of Winder’s manufacture. The plaintiff, instead of reworking the cradles, asked *804 that it be given a further contract for replacement cradles. The defendant, being unable to obtain the cooperation of the plaintiff in reworking the cradles, secured the needed cradles under a separate procurement. The defendant is entitled to recover on its counterclaim the amount of $8,525.82 as shown in finding 23.
CASE NO. 318-62
This is a suit on a contract for furnishing by Winder to the Army Signal Corps, of 146 rectifiers and related spare parts for a total contract price of $27,396.90 for the rectifiers and $2,716.75 for the spare parts. Contract modifications were issued and accepted, which increased the contract price to $38,343.69, and which extended the delivery time by more than two years. During performance, the contract proceeds were assigned to The Seminole Bank of Tampa, Tampa, Florida. The contract performance was completed by Winder Aircraft Corporation of Florida, except for a quantity of spare parts, of the value of $2,546.01. The entire contract price, less the latter amount, has been paid to the bank as assignee.
By the petition, Winder and the bank, as assignee, claim the sum of $68,131.03 on account of losses sustained by Winder by the following allegations:
1. That Winder was put to extra work necessitated by the requirement that it redesign, redevelop and re-engineer the rectifiers due to alleged defects in the drawings.
2. That Winder had been led to believe that component parts for the contract would be approved if acquired from a list of allegedly approved manufacturers furnished by the defendant.
3. That Winder was unreasonably delayed in obtaining component approvals.
As to the claim on account of extra work involved in the re-design of the rectifiers, the findings (particularly finding 37) show that this claim is almost frivolous in nature. In any event, there was a failure to exhaust administrative remedies, since no claim was made the subject of an appeal from a contracting officer’s decision. United States v. Utah Constr. & Mining Co., supra. Further, the extra work involved was the subject of change orders accepted by Winder. This would *805 constitute an accord and satisfaction under tbe circumstances of this case. Cannon Constr. Co. v. United States, 162 Ct. Cl. 94, 319 F. 2d 173 (1963); Brock & Blevins Co. v. United States, 170 Ct. Cl. 52, 343 F. 2d 951 (1965).
By the findings (particularly finding 46) it has been found that Winder was not unreasonably delayed in its performance of the contract. This disposes of the claim by Winder that it had been delayed in securing component approvals. Winder is not entitled to recover on the delay claim.
Since Winder is not entitled to recover on the claims asserted by it, The Seminole Bank of Tampa, as assignee, is likewise precluded from any recovery. As shown by the findings (see finding 43) the bank has been paid in full for all contract items delivered. It is entitled to no more.
Findings of Fact
CASE NO. 317-62
1. The plaintiff, Winder Aircraft Corporation of Florida,[1] is a corporation having its principal office in Dunellon, Florida. During the pertinent periods herein, its factory was located at Lakeland, Florida. It had, shortly before entering into the contract in suit, removed its manufacturing operations from Winder, Georgia, to Lakeland, Florida.
2. The plaintiff, The Seminole Bank of Tampa is a banking institution of Tampa, Florida, which had, over a period of time, made loans to Winder.
3. On January 31, 1956, the Navy Department, acting through the Bureau of Ordnance, issued an invitation for bids on a quantity of 55 quadpak cradles and 115 booster cradles which were urgently needed by the Navy for its fleet operations. The quadpak cradle is a device of rather simple manufacture, constructed primarily of sheet metal with some stiffening, and was designed for the purpose of transporting (as a container, open at the top) terrier guided missiles. The booster cradle is a similar device for transporting boosters for the terrier missiles. The quadpak cradle would hold two missiles and the booster cradle, one booster.
*806 4. The delivery requirement set forth in the request for bids was for 25 quadpak cradles and 50 booster cradles to be delivered on or before May 20, 1956, with the remaining number of 80 quadpak cradles and 65 booster cradles to be delivered on or before June 15,1956. The bids were publicly opened on March 2, 1956. Of the 28 bids received, Winder’s was the lowest responsive bid. It bid $110.31 each for the quadpak cradles and $96.40 each for the booster cradles, for a total bid of $17,153.05. The next lowest bidder quoted $156.54 on each quadpak cradle and $154.44 on each booster cradle. The other bids ranged upwards to over $1,000 for each quad-pak cradle and almost $800 for each booster cradle. The government estimate was $42,000 for the entire procurement.
5. On March 7, 1956, the contracting officer, being aware of the wide range in prices of the bids received and also aware that the government estimate was much greater than Winder’s bid, sent a telegram to Winder requesting verification of prices quoted and also stating that the cradles to be furnished were to be in strict conformance with the specifications referred to in the bid form.
The Winder firm sent a letter dated March 9, 1956 to the contracting officer, verifying the price which the firm had bid and confirming that the cradles would be furnished in strict conformity with the specifications. The letter requested that Winder be awarded the contract at such prices with an advance notice of award, so that it could expedite fabrication and shipment of the cradles.
Before receiving the letter, Mr. Simmet, the contract negotiator in the office of the contracting officer, telephoned Winder and spoke with its resident manager, A. B. Harris. Simmet inquired whether there had been an error in the bid prices. He was told that the bid prices had been checked, that no error had occurred and that a further letter to that effect had been sent to the contracting officer by Winder. Such letter dated March 13, 1956, was thereafter received by Mr. Simmet.
6. Thereafter, a preaward survey of the Winder plant and its capabilities was conducted by Navy representatives. It was found that the plant and its personnel had the capability to perform the contract. After carefully considering all of *807 the above factors, as well as a Dun & Bradstreet rating of Winder, Simmet recommended in writing on March 21,1956, to the contracting officer (defendant’s exhibit 4) that an award of the contract be made to Winder. This was done on March 28, 1956, by telegram, with the written contract documents to follow. The written contract followed in due course, but delivery of the contract items did not. There were delays.
7. On April 28, 195.6, in submitting a regular report on production progress, Winder reported1 that it was then difficult to determine whether there would be any serious factors which might cause delay in meeting the May 20 delivery schedule. On the next report of progress, Winder stated that there would be a delay in meeting the shipment due for May 20, because delivery of material needed for production would be delayed. This report was dated May 26,1956. In the meantime, a representative of the contracting officer, accompanied by the designer of the cradles (an employee of a private firm which had produced the prototype of the cradles) made a trip to the Winder plant to see what had been delaying deliveries. Winder representatives stated that the initial delay was due to inability to obtain necessary materials, but that such materials were on order and would be delivered within the week. Assuming delivery of the remaining materials by J une 1, the contractor stated that it could deliver the first cradles by June 8. Based upon what he saw, the Navy representative was of the view that August 15 was the earliest day that the cradles (which had been due for delivery May 20) could be delivered. No deliveries were made during June. During July, there were discussions between Winder and Navy representatives in which Winder asked for help in obtaining some items of needed material — seamless tubing. Efforts were made by Navy to locate such material, apparently without success. The matter of substituting stainless steel tubing was discussed and Winder’s president asked whether Navy would authorize a price increase for the substitution of stainless steel. The Navy representative stated he did not think that the contracting officer would consider an increase in price. This was on July 5,1956. At this time Winder’s president (Henry) stated that the tubing was the only item of material holding up de *808 livery and if be bad the tubing at that time, be 'believed that Winder could complete the contract by July 31 by working overtime. No deliveries were made in July. Because of the urgent need for the contract items, the company was authorized (on July 17, 1956) to make partial shipments in lots of five cradles.
8. After much prodding carried on by telephone calls from representatives of the contracting officer in Washington, and the Inspector of Naval Material (in Atlanta), as well as personal visits to Winder’s plant, deliveries of the contract items were made in 24 separate shipments as follows: [The first 23 shipments were made in 1956 and the 24th shipment was made in 1957.]

As each shipment was made, an invoice for such shipment was forwarded to the contracting officer and it was paid.
9. On or about August 3, 1956, Winder’s president (Mr. Henry) fired the factory manager. Henry then gave the performance of the contract work his personal day-to-day attention. By August 28,1956, Henry had fired the general manager, production superintendent and the shop superintendent. D. E. Henderson, a retired Air Force officer, was engaged as an administrative assistant to Henry. In a writing dated *809 August 28, 1956, to the Bureau of Ordnance, Washington, Henderson stated that Henry had been the victim of an incompetent staff both in the office and in the plant, and that the staff had “worked the Corporation into such a poor financial situation before he cleaned house that Mr. Henry has had to work day and night to keep the company going.”
10. The general provisions of the contract in suit are contained in Standard Form 32 prescribed by the General Services Administration, Nov. 1949 Edition, for supply contracts. The Inspection Clause provides as follows:
5. INSPECTION
(a) All supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and end products) shall be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event prior to final acceptance.
(b) In case any supplies or lots of supplies are defective in material or workmanship or otherwise not in conformity with the requirements of this contract, the Government shall have the right either to reject them (with or without instructions as to their disposition) or to require their correction. Supplies or lots of supplies which have been rejected or required to be corrected shall be removed or corrected in place, as requested by the Contracting Officer, by and at the expense of the Contractor promptly alter notice, and shall not again be tendered for acceptance unless the former tender and either the rejection or requirement of correction is disclosed.. If the Contractor fails promptly to remove such supplies or lots of supplies, when requested by the Contracting Officer, and to proceed promptly with the replacement or correction thereof, the Government either (i) may by contract or otherwise replace or correct such supplies and charge to the Contractor the cost occasioned the Government thereby, or (ii) may terminate this contract for default as provided m the clause of this contract entitled “Default.” Unless the Contractor elects to correct or replace the supplies which the Government has a right to reject and is able to make such correction or replacement within the required delivery schedule, the Contracting Officer may require the delivery of such supplies at a reduction in price which is equitable under the circumstances. Failure to agree to such reduction of price shall be a dispute concerning a question of fact *810 within, the meaning of the clause of entitled “Disputes.”
(c) If any inspection or test is made by the Government on the premises of the Contractor or a subcontractor, the Contractor without additional charge shall provide all reasonable facilities and assistance for the safety and convenience of the Government inspectors in the performance of their duties. If Government inspection or test is made at a point other than the premises of the Contractor or a subcontractor, it shall be at the expense of the Government: Provided, That in case of rejection the Government shall not be liable for any reduction in value of samples used in connection with such inspection or test. All inspections and tests by the Government shall be performed in such a manner as not to unduly delay the work. The Government reserves the right to charge to the Contractor any additional cost of Government inspection and test when supplies are not ready at the time such inspection and test is requested by the Contractor. Final acceptance or rejection of the supplies shall be made as promptly as practicable after delivery, except as otherwise provided in this contract; but failure to inspect and accept or reject supplies shall neither relieve the Contractor from responsibility for such supplies as are not in accordance with the contract requirements nor impose liability on the Government therefor.
( d) The inspection and test by the Government of any supplies or lots thereof does not relieve the Contractor from any responsibility regarding defects or other failures to meet the contract requirements which may be discovered prior to final acceptance. Except as otherwise provided in this contract, final acceptance shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud.
(e) The Contractor shall provide and maintain an inspection system acceptable to the Government covering the supplies hereunder. Eecords of all inspection work by the Contractor shall be kept complete and available to the Government during the performance of this contract and for such longer period as may be specified elsewhere in this contract.
11. The contract provided that final inspection and acceptance shall be made by the Inspector of Naval Material, Atlanta, Georgia, at or near contractor’s plant, Lakeland, Florida.
*811 12. Initially ('by some interservice arrangement) the inspection of finished units was delegated to an Air Force inspector who was not resident at the plant but who was to be called upon request to inspect and authorise shipment of finished items. It developed that any inspection performed by the Air Force inspector was at best perfunctory. About a week before the first shipments were due to be made, the Atlanta office of the Inspector of Naval Materials (INSMAT) sent a representative to the plant and found the quadpaks in their finished state to be poorly constructed. The Air Force inspector told this representative of INSMAT that he did not perform inspection, he only signed the shipping papers. It was apparent that Winder had no inspection procedure of its own until August 29,1956, when the plaintiff set up its own company inspection.
The delegation of inspection of the contract items to Air Force inspectors was promptly revoked by INSMAT and a Navy inspector who spent quite a bit of time at the plaintiff’s plant was detailed to the inspection task. He found fault with the work in process and demanded that the first 25 quadpaks be reworked. Some of the quadpaks were reworked in some measure. Under pressure from the operations officers who needed the items for placement aboard a ship with early sailing orders, the first 25 quadpaks were accepted by the Navy inspector and sent to Yorktown, Virginia.
13. On September 19, 1956, a Navy commander from the Bureau of Ordnance (Commander Gray) visited the Winder plant and determined that the work in process at the plant was not being accomplished in conformity with the contract specifications. The deviation was related to the positioning of the stiffeners on the side rails of the quadpak and also to the fact that the side rails were not of unit construction, but had been made of two pieces welded together. Winder was advised that the Navy inspector could not accept any units with such deviations unless a written authorization for such deviation had been received from the contracting officer.
Henry (Winder’s president), on September 20,1956, wrote to the Bureau of Ordnance in Washington requesting waivers for these two deviations from specifications. He followed *812 this with, a further letter of September 27, 1956, stated that “[s]toppage of work on this contract is costing this corporation approximately $2500.00 per week and is delaying production of items under contract to other Government Agencies.”
On October 1, 1956, the Bureau of Ordnance granted a deviation on the quadpak cradles relating to the positioning of the stiffeners on the side rails for units 85 through 47. This deviation applied to quadpaks which were on the production line at the time of Commander Gray’s visit to the plant. A deviation was likewise granted as to 5 quadpaks which allowed the use of welded side rails. The October 1 letter stated that the remaining units were to be constructed in accordance with the contract drawings. Further waivers were requested by Winder by letter of October 1, 1956, and allowed by the Navy’s letter of October 10,1956.
14. Although Winder complains that the Navy interfered with and stopped production of contract items, the proof shows that the Navy inspectors did not interfere with or stop production in any way. They merely told the responsible officers of Winder that they would not accept contract items which deviated from the contract specifications, unless a written authorization to do so was received from the contracting officer. The contract terms were quite specific in requiring such written authorization for deviations from specifications.
It is found that there was no stoppage of production by representatives of the defendant.
15. On August 28, 1956, for the first time, Winder (through Henderson) advised Navy representatives of a mistake which it said had been made in the bid. This was followed by a letter of September 28, by Henry, in which he requested an increase in the contract price of $198.99 each on the quadpaks and $141.88 each on the booster cradles for a total increase of $27,261.80. The letter indicated that other factors contributed to losses to the plaintiff — increases in material costs and a greater amount of engineering and experimental work than had been expected.
As to the mistake in bid, Winder claims that an error had been made in submitting its bid by misplacing a decimal point *813 in the number of hours of direct factory labor required to produce both the quadpaks and the booster cradles.
No original work sheets or copies of them were produced or referred to. The estimator was not identified. The letter stated that this error “was only recently discovered by a new member of our staff on a routine audit of the contract account.”
The testimony at the trial concerning the alleged mistake in bid was not convincing. I-Ienry testified merely that a mistake in the bid had been discovered and that the cause of the mistake was the misplacing of a decimal point in the number of labor hours required for the production of the contract items.
16. Although Winder complains of faulty design of the contract items by the Navy, the evidence shows that prior to the award to Winder, the defendant had engaged another company (an unsuccessful bidder on the advertisement for bids resulting in the contract in suit) to design the items and produce a limited number of prototypes. This was accomplished to the satisfaction of the Navy which urgently needed the items. No complaint relating to design was made by Winder until after the initial 25 quadpaks were found to be unacceptable to the using service (except for 3 quadpaks which were used in the rush to get them aboard a departing ship). Except for the 3 quadpaks mentioned above, none of the items produced by Winder were utilized by the Navy, because of defective workmanship. Since the Navy still needed some of the items, it advertised for a further procurement of identical items, using the same specifications, and another contractor produced the items without difficulty to the complete satisfaction of the using service.
17. The Navy returned 25 quadpaks to Winder’s plant to be reworked. Winder correctly called to the attention of the Navy that two of the items were not of its manufacture, having the identification of the firm which had designed and made the initial prototypes. Winder temporized with the Navy, requesting a further contract for additional items. The contracting officer finally gave up on his demand that the defective quadpaks be reworked and secured the needed items from others under separate procurement.
*814 18. The Seminole Baiib of Tampa was to the Assignment of Claims Act of 1940) of the proceeds of the contract in suit, as well as other government contracts. This bank advanced funds to Winder, which were utilized in the performance of the contract work. Since Winder was paid the full contract price, the government checks in payment therefor, were made payable to the bank as assignee.
19i. Winder, as of the date of trial, owed The Seminole Bank of Tampa, on account of monies borrowed on this and other contracts, a 'balance of $44,813.71.
20. On October 29,1956, Winder filed a claim pursuant to Title II, First War Powers Act, as amended and Executive Order 10210. This claim was thereafter rejected.
21. Winder filed no claim for relief redressable under the terms of the contract. Accordingly there was never presented any appeal from any contracting officer’s decision.
22. On February 5, 1960, plaintiffs’ counsel filed a claim with the General Accounting Office for $50,531.53. This claim (which was based on the same matters alleged herein), was denied on the merits on November 21,1961, in Comptroller General’s decision B-143250. On December 15, 1961, plaintiffs asked for reconsideration. The claim was again denied on May 25,1962.
23. As a result of Winder’s delivery to the government of 23 defective quadpak cradles, and failure to rework them, the government claims damages under the guaranty clause of the contract. The government’s counterclaim includes the contract price of 25 cradles (25 quadpak cradles @ $110.31 = $2,757.75). The cost of excess inspection at Yorktown Naval Mine Depot was $456.67. The cost of shipping the cradles to and from the Winder factory in the effort to have Winder rework the cradles was $326 on February 18, 1957, and $342 on September 17, 1957. The government’s claim thus totals:
Eefund _$2, 757.75
Inspection _ 456.67
Transportation_ 668. 00
Total_$3, 882. 42
Each quadpak cradle contained about 200 pounds of scrap steel worth at most one cent per pound. Accordingly, there *815 must be deducted from the gross claim the sum of $50 (5,000 pounds of scrap steel at one cent per pound) to produce the net damage amount of $3,832.42. Since 2 quadpaks so returned were not of plaintiff’s manufacture, only 23/25 of the latter amount (or $3,525.82) remains chargeable to the plaintiff, Winder.
24. On December 10, 1966, Henry sent a personal letter, with enclosure, to the commissioner (copies of which were subsequently made available to counsel by the commissioner). The essence of this letter is that The Seminole Bank of Tampa has assigned its interest in this claim to Marion County, Florida, in a transaction also involving Armco Steel Corporation. The attorney of record for both parties plaintiff (Winder and the bank) subsequently submitted to the defendant (with copy to the commissioner) three affidavits purporting to explain the situation outlined in Henry’s letter to the commissioner. A notarized letter dated January 20, 1967, from Marks (president of the bank), asserts that the bank had, prior to the conveyance to Marion County, Florida, three security interests in Winder property — one was an assignment of the proceeds of the government contract; a second interest was a mortgage on property in Dunellon, Florida, as additional collateral to secure obligations from Winder to the bank (this mortgage was executed after cancellation or termination of Winder’s government contracts) and the third interest was an assignment of the claims in litigation in this court. These claims are reported to have been assigned simultaneously with the filing of a hiaim against the government. According to Marks, only the second interest — the mortgage on property in Dunellon, Florida — was conveyed to Marion County. Marks asserts that any judgment by this court in this case should be for Winder and the bank jointly. Two affidavits disclaiming any interest were submitted to the commissioner (with copies to the defendant) on April 4, 1967. These affidavits are from the attorney for the Board of Commissioners of Marion County, Florida, and from the Area General Manager of Armco Steel. The assignment of the claim mentioned in the Marks affidavit could be the same one mentioned in Marks’ testimony, because the latter was executed on October 29, 1956, *816 the same date Winder made a application for Title II relief. It thus appears that the plaintiff bank may claim under a statutory assignment of the proceeds of a government contract, an assignment of interest in Winder’s Title II application, and another assignment to secure loans in August and October 1956.
CASE NO. 318-62
25. Plaintiff herein (Winder Aircraft) is the same plaintiff referred to in finding 1 of case No. 317-62. At the time the contract in suit was awarded to plaintiff, its principal office and factory was located at Winder, Georgia. During performance of the contract, the principal office and factory were removed to Lakeland, Florida.
26. Plaintiff, The Seminole Bank of Tampa, is a banking institution of Tampa, Florida, which had, over a period of time, made loans to Winder.
27. On May 24, 1954, the defendant, acting through the Signal Corps ‘Supply Agency, United States Army, issued an invitation for bids for 146 rectifiers KA-91, spare parts and certain related literature. The delivery requirement for the rectifiers was indicated as a desired schedule on the information for bid with the date to be filled in by the contractor under a column headed “Contractor’s Schedule.” Upon acceptance of the bid which took place on June 30, 1954, the dates given in the contractor’s schedule were to become the agreed contract delivery schedule. As to item 1 (the rectifier) the delivery dates for the preproduction samples and production quantities were as shown below:
Preproduction Samples-3 Sept 1954.
Production quantities for inspection (46 each)_2 Dec 1954.
Complete (balance of 100 units)_3 Jan 1955.
Winder received its notice of award on July 3,1954.
28.The rectifier called for by the contract in suit was an item which had been successfully produced by one other firm pursuant to an earlier procurement. After the award to Winder, a further award for a number of units was made to another firm which produced the units satisfactorily. A rectifier is a device to convert alternating current to direct *817 current for charging storage 'batteries used in telephone systems.
29. The contract price for the rectifiers was $187.65 each, or a total of $27,896.90 for 146 units. Spares added an additional $2,716.75 to the contract price.
30. The contract performance called for a minimum of engineering. It was essentially an assembly job. The plaintiff fabricated the chassis, purchased various components from other manufacturers and fitted such components onto the chassis as required by the drawings.
31. The original contract required the contractor to obtain government approval of major electronic components which the contractor proposed to use in the model RA.-91 (x) rectifier. Contract Modification No. 4 added clause 114 entitled “Use of Standard and Non-Standard Parts, Materials and Processes in Signal Corps Equipment.” This clause did not add a new requirement for government approval of components. It merely restated the requirements for convenient reference. Winder’s president evidently failed to consult these contract provisions because he was under the misapprehension that there was no contract requirement for component approval prior to Modification No. 4. The original requirements for component approval are found in the contract specifications which require the submission of samples for approval. The requirement for approval of the transformer is found in paragraph 3.1 of specification MIL-T-27, which is cited in clause 28 of the original contract. This same provision also requires approval of the inductor. Paragraph 3.1 of specification MIL-M-6a, also cited in the original contract, makes the same requirement as to ammeters. The contract originally called for a selenium rectifier, model B-398, as manufactured by 'the International Rectifier Corporation. Modification No. 2 substituted a different set of drawings. These drawings, which are in evidence, refer to specification MIL-R-11050. This specification requires component approval. Modification No. 2 made a few changes in the construction of the frame, some portions of the transformer and the selenium rectifier. The model RA-91(c) rectifier remained essentially unchanged. Winder’s president testified that Winder was paid only “a little over $2,000” for this *818 modification. The record indicates was paid $6,629.86.
32. It was the contractor’s responsibility to inform the government of the components it planned to use, so that the government could ascertain whether they met the contract specifications. Accordingly, by Technical Action Request (TAR) No. FEB 2 dated 16 July 1954, the Signal Corps Engineering Laboratory (SCEL) requested this information. Winder submitted the information a month later, on August 17, 1954, and was advised that four items were approved, and that four items had “not been previously evaluated, and samples must be submitted to these Laboratories for test before approval can be granted * * Winder could have had its suppliers submit samples, or submit them itself. When the samples were received the Field Engineering Branch (FEB) of the laboratory would transfer them to the testing sections. Winder would subsequently be informed by a TAR whether the components passed the required tests. The contract did not specify the time the tests would take, but the TAR FEB 2 indicated approximate times. The contract also required, in addition to approval of components, approval of two preproduction models. Winder had the choice of submitting samples and models simultaneously or otherwise. On September 16,1954, Winder chose to submit the samples first. By October 1954, Winder had not submitted any samples, although one of its suppliers (Kotron) had sent rectifier samples directly to the laboratory.
33. Some 18 months elapsed from the award of the contract on June 30, 1954, until approval of all of the components selected by Winder on January 23, 1956. This delay was caused by the fact that many of the components chosen by Winder did not comply with the contract specifications. Since the RA-91 (c) rectifier was for military use in extremes of climate, these requirements were necessarily exacting. Winder has never questioned the accuracy of the tests conducted by the SCEL. Winder did not submit any component samples for approval until December 1954. There were no unexplained delays in approval of components. The government in fact promptly tested Winder’s samples and notified Winder of the results. Four major components required ap *819 proval. These were the inductor, the ammeter, the selenium rectifier, and the transformer.
(a) Inductor. The inductor required for the end product was also known as a choke or a reactor. Samples of an inductor manufactured by Utah Eadio Products Co. were submitted on December 7, 1954. These samples failed several tests and were rejected on February 25,1955. A revised model by the same manufacturer was submitted on July 11, 1955. After testing, this inductor was approved on September 27, 1955.
(b) Ammeter. Burlington No. 921 ammeters were approved without testing on October 6, 1954. Signal Corps personnel subsequently decided that the ammeter should be tested to determine whether it would meet the overload requirements. Samples were submitted by the manufacturer. These samples actually did not meet the overload requirements, but these requirements were determined to be excessive because of other design features of the BA-91 (c) rectifier. The ammeter was approved on February 25,1955. Almost two years later, in December 1956, Winder submitted a Eequest for Priorities Assistance to the Signal Corps Supply Agency. An indorsement was prepared by Mr. Davis for the contracting officer’s signature on the same date the application was received. On the Eequest for Priorities Assistance Winder noted that it placed an order for the ammeters on August 16, 1954, which was accepted by the supplier on October 13, 1954 — but Winder “did not give supplier go ahead to complete order until August 1956 * * This represents a delay for which the government could not possibly be responsible.
(c) Selenium Rectifier. Winder did not submit selenium rectifier samples. They were submitted directly by Kotron on December 21,1954. These samples (which did not comply with the specifications) failed the tests and were rejected on February 7,1955. Additional samples were submitted by Ko-tron on February 24,1955. These units 'also failed many tests. The laboratory disapproved the second batch of Kotron samples on May 3,1955, and suggested four alternate sources of supply.
*820 (d) Transformer. Transformers manufactured by Eadio Products were first submitted by the manufacturer on December 7,1954. They failed several tests and were rejected on February 25, 1955. A second sample was submitted on August 10,1955, and rejected on November 10,1955. Tbe government suggested two alternate sources of supply. On December 28, 1955, Winder requested approval of the Carol transformer because of “slow action” by Utah Eadio Products. This “slow action” is explained by a letter from Winder on January 12, 1956, which says Utah Eadio Products had said it would take some 60-90 days to prepare samples. The laboratory, on January 13,1956, confirmed the advice it had given to Winder’s president on December 21, 1955, that he could not get acceptable transformers from two other companies. The laboratory subsequently approved the Carol transformers without testing. This approval was confirmed in writing on January 23, 1956. In April 1956 Winder was complaining that Carol’s delay in making deliveries to Winder was delaying Winder’s performance.
34. At the time that Winder was experiencing difficulty in obtaining approvals for the components it wanted to use in the rectifier, the Army Signal Corps had no list of approved major components, or “Qualified Products List.” Winder’s president was obviously misinformed in his subsequent belief that at one time there was such a list. He may have been confused by the fact that government representatives did suggest certain accepted components to Winder after the components selected by Winder failed to pass certain tests. He admitted that Mr. Harris really knew more about the matter than he did. In fact, in its letter of November 12, 1955, to the Signal Corps, plaintiff (by A. B. Harris) flatly stated they were informed that no lists were available and “since no Qualified Products Lists were available, we dealt with reputable suppliers which warranted their products would conform to specifications.” In any event, except when it appeared that a contractor was experiencing great difficulty in finding acceptable components, the Signal Corps Engineering Laboratory did not advise contractors what components to use, or volunteer information as to which suppliers’ products were regarded as acceptable and would therefore require *821 no testing. This was particularly true where there had been only one prior source for a component. Winder failed to show that it was injured by this practice, because even where the drawings indicated a selenium rectifier manufactured by International Rectifier Corporation, Winder did not see fit to use what was indicated to be the best material, but submitted less expensive components for testing.
35. There was no indication that the Signal Corps Engineering Laboratory was inefficient or careless or needlessly slow in testing components submitted by Winder, or in informing Winder of the results of such tests. To the contrary, the evidence indicated that there was effective liaison with the laboratory. The laboratory did have a heavy workload but the testing program proceeded without interruption. In fact, Winder’s one mention of the testing as a cause of delay indicated it was just one factor. Winder did not allege that there was any delay in the conduct of the tests — it merely indicated that the requirement for testing and approval made it difficult for Winder to obtain firm commitments with the suppliers of its choice. Evidently the contracting officer did not consider this a complaint about the speed of the testing, because Winder’s letter was not brought to the attention of technical personnel. The complaint — if it was intended as such — was in any case not made until November 1955. The last component approval was granted a few weeks later. Winder’s so-called complaint was really a defense to the contracting officer’s complaint about Winder’s delays, offering excuses and explanations for the delays that had already taken place. Any such complaint, had it been seriously embraced by Winder, would probably have been presented early and unambiguously. During the period when the laboratory was testing components, Winder actually evidenced appreciation for the laboratory’s efforts to expedite the testing of components selected by Winder. In fact, the allegation that the government delayed Winder’s performance of the contract is an afterthought, and was first raised in this court. When Winder first announced, in March 1958, that it contemplated making a claim, it indicated its claim would be for changes. This was in fact the claim presented as an application for Title II relief.
*822 38. The contract required, electronic components, that two preproduction samples must be approved. These samples could be submitted either concurrently with the components, or earlier or later. On September 16, 1954, Winder wrote that it preferred to submit components 'before the preproduction samples. Winder’s letter of January 15, 1955, indicates that the contracting officer’s representative was urging Winder to submit preproduction samples without waiting for component approval.
Winder submitted two preproduction samples on February 14, 1955. Both failed several tests and were rejected by the SOEL on April 4,1955. The testing was delayed by Kotron’s substitution, with Winder’s approval, of different selenium rectifiers. Winder thanked the government field engineer for expediting these tests. The SOEL noted a long list of errors in two preproduction samples. Winder’s president was mistaken in his belief that there were no substantial defects in these samples. Winder submitted another preproduction sample on June 18, 1955. It was approved, although with several defects noted, on July 15, 1955. This approval meant that the SOEL felt that Winder could produce an acceptable rectifier, but that the manufactured items would be cheeked carefully against the list of defects noted in the preproduction sample. Winder’s president made vague allegations at the trial that the SOEL somehow acted improperly in rejecting the first two preproduction samples. However, no protest was made and no appeal taken.
37. During fabrication of the first two preproduction samples, Winder noted several minor errors in the government drawings. These errors were reported by Winder’s project engineer in a letter dated February 9,1955. These errors were acknowledged and corrected by a Technical Action Bequest on April 4, 1955. Winder’s factory manager also suggested dimensional changes by a letter dated April 21,1955. Some of these suggested changes were made by the TAB issued on April 29, 1955; the others were approved by a TAB issued May 6,1955. Winder’s president characterized these drawing errors as “engineering problems” at the trial. While they may perhaps be so described, it appears that the errors were few in number, minor, obvious and readily corrected. The trifling *823 nature of these so-called “engineering problems” is illustrated by tbe fact that Winder’s former shop foreman, who worked on the rectifiers, did not recall any drawing errors. The errors were in fact corrected during the fabrication of the first pre-production samples. The errors were of the type that often occur. They had no effect on production and Winder had no production problems. The corrections which are marked in red on the drawings were formally authorized and compensated pursuant to the “Changes” clause of the contract by Modification No. 10 and No. 11. These modifications increased the contract price from $36,743.51 to $38,343.69 and extended the delivery schedule more than two years.
38. At the trial, in answer to a question from counsel whether there was “any other element in your claim regarding the Signal Corps contract that you have not discussed” Winder’s president stated that there had been “inspection difficulties in the Signal Corps contract.” By way of elaboration, he said that they were similar to the alleged difficulties in performing the Navy contract in case No. 317-62; that Air Force inspectors did not go by the same rules as Army inspectors, and different types of inspection caused different types of delay. Similarly, in the revised application for Title II relief, which was filed by counsel on August 25, 1960, it is alleged that inspection problems increased the costs of Winder. There it was alleged that the Air Force and Navy were all involved in inspections that delayed Winder. An inspection of exhibits Nos. 60 through 72 to Winder’s revised Title II application which was submitted by Winder to document inspection delays, does not support this allegation. Most of the exhibits document delays by Winder’s suppliers. A letter from Winder dated November 19, 1956, informed Mr. Schumacher (the Air Force quality control representative), that Winder was not ready for inspection. On March 30,1956, Winder furnished some technical information to Mr. Schu-macher, so that he could relay it to a Navy inspector at the Utah Badio Products factory. There is no showing as to why the Navy inspector wanted this information. In any event, he had nothing to do with Winder. This request, in May 1956, without any indication that Winder should halt production, or that shipments from Utah Badio Products would be *824 delayed, could hardly have delayed Winder. 1956, Winder complained that the Air Force quality control officer did not have shipping information for 20 completed end products. This problem was evidently caused by Winder’s own failure to request shipping instructions. In any event, it seems to have been expeditiously solved with the cooperation of the Air Force personnel involved. Winder evidently learned its lesson, because subsequently, in November 1956, it requested shipping instructions. In short, there is simply no evidence to substantiate the allegations of delays caused by inspection. The documentary evidence indicates that whatever delays in shipping Winder may have encountered were its own fault; that the Air Force cooperated to expedite the matter.
39. The delivery schedule when the contract was awarded to Winder on June 30,1954, required submission of the pre-production samples and the technical literature for approval by September 3, 1954; delivery of a manual supplement by November 2, 1954; production quantities of BA-91 (c) rectifiers and components for inspection by December 2, 1954; and completed delivery of 146 rectifiers by January 3, 1955. On July 9,1954, the government notified Winder that revised drawings would be forthcoming. Technical Action Bequest No. FEB 1 dated July 12, 1954, recommended that the new drawing list supersede the one in effect when the contract was awarded. Meanwhile, on July 13,1954, Winder acknowledged notification of the proposed change, and indicated that it had been notified in ample time to stop its efforts, pending a change. Also on July 13, 1954, the contracting officer sent Winder the revised drawings and asked whether the revised drawings would result in :a price increase or affect the delivery schedule. On July 24,1954, Winder responded by submitting a quotation of $48.25 additional per unit, or $7,044.50 for the 146 units. The letter indicated that a time extension of 60 days should be allowed. By Technical Action Bequest dated August 10,1954, Winder was authorized to expend not more than the above amount in connection with the changes made, and was authorized to proceed. The parties thereafter agreed (by Modification No. 2 dated October 1, 1954) on a price increase as a result of the drawing change. Another *825 supplemental agreement (Modification No. 4 dated August 19, 1955) revised the delivery schedule in light of the changes and “various other manufacturing difficulties.” Submission of the literature was postponed from September 3, 1954, to December 30, 1955. Submission of the production quantities of rectifiers, components, and spare parts for inspection -was extended from December 2,1954, until December 30, 1955. Completion of deliveries was extended from January 3,1955 to January 30,1956. Another supplemental agreement (Modification No. 10 dated March 28, 1957) extended the time limit for delivery of the undelivered balance of 70 rectifiers to May 31,1957. Still another supplemental agreement (Modification No. 11 dated September 6,1957) deleted the requirements for technical literature. Winder actually completed delivery of 146 rectifiers just prior to March 31, 1958 and never delivered the required spare parts.
40. On July 12, 1956, Winder requested a price increase for spare parts, noting that the price increase for the drawing change in Modification No. 2 did not apply to spare parts. The contracting officer requested supporting data on July 25, 1956. No information having been received from Winder as to the spare parts claim and several others, the new contracting officer inquired about their status on January 8, 1957. On February 2, 1957, Winder’s president advised his factory manager (James L. Green) that the contracting officer and Mr. Davis would visit Winder’s plant on February 12 and 13 and asked Mr. Green to assemble some supporting data. There is no mention of this visit in any document or testimony. Apparently, it did not materialize. On February 18,1957, Winder requested a price increase of $4,188.42 to compensate it for several Technical Action Bequests, including the spare parts changes. In April 1957 the contracting officer visited Winder’s plant, and discussed the requested price increase. On May 8,1957, Winder furnished additional financial data requested by the contracting officer. On May 18, 1957, Winder accepted the contracting officer’s decision allowing Winder a total of $1,600.18. This compensated Winder for the changes required by TAR Nos. FEB 1, 3,4, 6, 9,11, 13, 14 and 18. It denied Winder compensation for the rejection of various components submitted for approval. This de- *826 cisión resulted in Modification No. 11 to the contract, executed by Winder’s president and dated September 6, 1957.
41. Obtaining approval from the Signal Corps Engineering Laboratory for the four major electronic components did take time. This was only one of a great many factors that prevented Winder from performing its contract as quickly as the parties had hoped. Winder admitted that its choice of suppliers had turned out to be poor. A major problem for Winder was its inability, even after the SCEL approved components, to obtain timely deliveries from its suppliers. Winder’s frustrations and disappointments are thoroughly documented. On May 9, 1955 (almost a year after the award of the contract) Winder blamed the delay on Kotron and Utah Radio Products. On June 29, 1955, Winder noted that switches, plugs, wire and cable had been late in arriving. These items, of course, did not require government approval. Winder characterized the testing of components by the SCEL as a minor factor. On November 12, 1955, Winder blamed Utah Radio Products for the delay in getting acceptable transformers. On January 12, 1956, Winder again criticized Utah Radio Products for delay in submitting samples of its transformers and announced that, as a result, Winder had decided to do business with Carol Electronics. On March 1, 1956, Winder admitted that it was unable to obtain supplies of the components that had long since been approved by the SCEL. According to this letter, Carol Electronics, Utah Radio Products and International Rectifier were simply not making shipments as promised. On March 27, 1956, Winder reported that it was receiving delayed partial shipments from its suppliers, and that this had “washed out” its production schedule. Carol Electronics’ shipment of transformers, promised for early April had not been received by April 16, 1956. On April 28,1956, Winder asked the contracting officer to help persuade Carol Electronics “to deliver transformers as promised * * Winder reported that International Rectifier had “also been dilatory * * On May 1, 1956, Winder was still being delayed by Carol Electronics and International Rectifier. Winder’s president’s letter of June 14, 1956, indicates that International Rectifier would not even ship the long-promised rectifiers to Winder before June 25 *827 and 27,1956. It also appears from this letter that Carol Electronics had not yet completed delivery of the transformers for the KA-91 (c). While the reasons for Winder’s difficulties with its suppliers are not indicated by the record, there is no reason to believe that these delays were in any way the fault of the government. In fact, it appears that the government personnel tried to help.
42. On August 21, 1956, Winder’s president, Mr. Henry, wrote a letter to the contracting officer in which he complained of losses on the instant contract in pleading for consideration for the award of an additional contract which had been advertized for bids and on which Winder had bid somewhat higher than two other firms. The letter is quoted below:
Subject: IFB SO-36-039-56-879-55
Submitted for Opening: 22 May 1956 (Also) Contract PHILA-25752-54-58-31 Dear Lieutenant Hertz :
I am writing you regarding the above numbered IFB covering a quantity of BA-91 () rectifiers in the following increments:
The Winder Aircraft Corporation of Florida bid as follows on these rectifiers:

Quantity

From To Unit Price

289 ea- 578 ea_$268. 39
579 ea_ 867 ea_$257.12
868 ea_1158 ea_$247.02
The only reason we could produce these units at the above quotations is because we have all of the necessary tools, jigs, dies, fixtures and test equipment, plus the fact that we are now in production on these items. While it. is our desire to work with and produce items for the Signal Corps, we find that our outright losses in actual cash make it difficult to continue as we have in the past. We are not suggesting that the Signal Corps wishes to put their suppliers out of business through bidding too low on contracts. We feel that you need the small contractor, with know how and facilities to produce items needed; and on the other hand we need your understanding and cooperation.
Frankly, we have lost as much money on the referenced contract as the total contract amounts to in dollars and cents and we have every reason to believe that Carol Electronics Corporation of Martinsburg, West Virginia *828 did not bid this contract because they too had suffered losses.
The system employed by the U.S. Army 'Signal Corps on IFB bidding may be a fine thing from the Government’s viewpoint, but from the standpoint of the small contractor, we find that there is no way to get an award except to take it at a loss and that thereafter there is no way to make up this loss because some other bidder unfamiliar with all the technicalities involved will bid lower on the next go around.
I know that all of this is no concern of yours, but thought perhaps you might want to pass it on up the ladder of military channels. I feel that the Government is interested in ¿lowing what is taking place throughout the country with small contractors. For our part, we find it very costly to tool up for these jobs with the U.S. Army Signal Corps. As heretofore stated, it seems to be impossible to get a first contract except at a loss, therefore, it may be that the Signal Corps’ supply of contractors will dwindle away eventually to an insufficient number to meet a serious emergency.
I would further like to state that the Signal Corps will be waiting a long time getting this order completed from either one of the firms which were lower than the Winder Aircraft’s bid on this award. This is no reflection on either of these contractors but simply a statement based on experience and knowledge in getting these units approved by Fort Monmouth and all of the various components tested in accordance with Fort Monmouth requirements.
43. On March 18,1958, the contracting officer notified The Seminole Bunk of Tampa (Winder’s assignee pursuant to the Assignment of Claims Act of 1940) that all undelivered items on the contract in suit must be delivered by April 1, 1958, and that a failure to so deliver would result in a termination of the contract for default. The remaining rectifiers were delivered by the time indicated. Invoices were submitted and the defendant paid the assignor in full for all contract items delivered. Although Winder did not complete the shipments of spare parts, having a contract value of $2,546.01, the bank was advised that such would not be reprocured and charged back against the bank.
44. Despite the contracting officer’s letter of March 18, 1958, advising the bank’s attorneys that disputes concerning *829 the contracting officer’s actions could 'be appealed to the Armed Services Board of Contract Appeals, Winder submitted two somewhat ambiguous “preliminary claims” on July 26 and July 30, 1958. The letter of July 26, 1958, was acknowledged by the Legal Division of the Signal Corps Supply Agency. The bank expressed its interest in the claim on June 15, 1959. Winder and the bank then filed an application for Title II relief on July 10,1959. The contracting officer requested correction of erroneous figures and inclusion of missing exhibits on July 20, 1959. Winder complied by letter dated July 31,1959. At a conference which took place at the Signal Corps Supply Agency on August 2 or 8,1960, Winder’s president promised to submit additional data in support of its claim by August 31,1960. This additional data was submitted on August 25, 1960, and received August 29, 1960. This is apparently the submission the bank’s president had in mind when he testified that a Title II claim was filed on August 27,1959. Winder’s application was denied on June 6, 1961, by Major General H. L. Scofield, Chief, Procurement & Distribution Division of the Office of the Chief Signal Officer. Winder was notified by the contracting officer on June 16, 1961. A claim was filed on September 22, 1961, with the General Accounting Office; it was denied on May 25,1962.
45. No claim redressable under the contract was filed by either the bank or Winder.
46. Winder was not unreasonably delayed by any action of the defendant in its performance of the contract in suit.
CONCLUSION op Law
Upon the foregoing findings of fact and opinion which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that neither plaintiff is entitled to recover and the petitions in both cases are dismissed ; on the defendant’s counterclaim, the defendant is entitled to recover from the plaintiff, Winder Aircraft Corporation of Florida, in case No. 317-62, the amount of $3,525.82 and judgment is entered for defendant accordingly.

 50 U.S.C.A, §§ 1431-35.

 Hereafter sometimes referred to as Winder.